Argued and submitted May 29, reversed July 27, 1981

In the Matter of Diane Chapman, a Child.

## STATE ex rel JUVENILE DEPARTMENT OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

## CHAPMAN et al,
*Appellants.*

(No. 37,783, CA 19630)

631 P2d 831

James Bradford Benziger, Portland, argued the cause and filed the brief for appellants.

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, William F. Gary, Deputy Solicitor General, and Al J. Laue, Assistant Attorney General, Salem.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

ROBERTS, J.

**ROBERTS, J.**

The parents appeal from an order terminating their parental rights in their four year-old daughter. The facts amply demonstrate the unusual manner in which the state proceeded. On May 20, 1980, police were called to the Chapmans' home to investigate a family disturbance which had been reported by a neighbor. The deputy who responded to the call found no disturbance, but, finding the house "filthy" and both parents "drunk," he took the child, Diane, into protective custody. The next day, an order was signed committing Diane to the temporary care and custody of the Children's Services Division. Two days later, a petition was filed seeking termination of parental rights. Thus, within three days of the first indication that there was any possible problem in the family home, the state took formal steps to sever the parent-child relationship. The parents have not been permitted to see the child since she was first taken from the home.

On appeal the state argues that it based its actions on determinations made in proceedings before Diane was born in which the Chapmans' rights in three older children were terminated. The state argues that the conditions which existed then are "essentially uncurable" and "continue to exist," thus establishing that "the appellants are not capable of providing this child with the necessary parenting." In order for termination to occur, ORS 419.523 requires the court to find:

"* * * [T]hat the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.

"(b) Conduct toward any child of an abusive, cruel or sexual nature.

"(c) Addictive use of intoxicating liquors or controlled substances.

"(d) Physical neglect of the child.

"(e) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be affected.

"* * * * *"

■     A significant portion of the state's case against the Chapmans was built upon the termination of their rights in the other three children in 1974, and previous psychiatric examinations of the parents, though the psychiatric diagnoses were 25 years old.[1] There was no testimony received at this hearing as to the present psychological status of either parent. It is the state's position that the father's mental retardation and the mother's previously diagnosed hebephrenic schizophrenia are unlikely to change and that, if the parents were mentally, emotionally and psychologically impaired in 1974, that condition continues today. The persistence of, or improvements in, the parents' mental conditions is beside the point: the fundamental issue in a termination case is whether or not parents are "unfit by reason of conduct or condition seriously detrimental to the child." Mental health is only one of many factors to be considered.

■     Our review of the record is *de novo,* ORS 419.561(4), ORS 19.125(3), with, of course, due regard for the decision of the trial court which had an opportunity to see the witnesses. *State ex rel Juvenile Dept. v. Maves,* 33 Or App 411, 576 P2d 826 (1978).

The state presented four grounds for termination in its petition: (1) the family residence was filthy and rodent infested, (2) the child Diane was filthy and, on May 20, 1980, was at a neighbor's house unbeknownst to her parents, (3) both parents had a history of alcoholism and were, on May 20, 1980, drunk, and (4) parental rights in three other children had been terminated in 1974, based,

---

[1] The files in evidence contained, as the most recent psychological reports, a 1956 evaluation on Mrs. Chapman, done at Eastern Oregon State Hospital when she was confined there for seven months at the age of 17, and a report from Southwest State Hospital, Marion, Virginia, on Mr. Chapman dated 1955, when he was 16 years old.

among other things, on the mental illness and mental deficiency of the parents.[2] Seven witnesses testified for the state at the hearing, including neighbors, a psychologist, the CSD caseworker, the juvenile court counselor, and the foster mother with whom the child was placed following her removal from the home.

_____

[2] The petition stated:

"2. The child is within the jurisdiction of the Court by reason of the following facts:

"A. The conditions and circumstances of the above-named child are such as to endanger her welfare and the child's parents, Leslie and Constance Chapman, have failed to provide the child with the care, guidance and protection necessary to her physical, mental and emotional well-being, to wit:

"1. On May 20, 1980, police observed the family residence to be filthy, rodent infested, and permeated by a foul odor, with spoiled food in the kitchen, litter throughout the house, and soiled pampers and blankets in the child's room. The parents were in the residence intoxicated to the point of apparent confusion and incoherence. The mother was unaware of the whereabouts of the child.

"2. On May 20, 1980, the child was observed at a neighbors house to be filthy and foul smelling, having recently fled a family disturbance in the family residence.

"3. Both parents have a history of alcoholism.

"4. On September 23, 1974, the parents' parental rights to three children were terminated, based, inter alia, upon findings that the mother was mentally ill and the father mentally deficient. Both parents remain incapable of providing adequate parenting by reason of impairment of emotional, mental and psychological condition and abusive use of alcohol.

"B. Leslie and Constance Chapman are unfit by reason of conduct and condition seriously detrimental to the child and reintegration of the child into the home of the parents is improbable in the foreseeable future due to conduct and condition not likely to change, to wit:

"1. On September 23, 1974, the parents' parental rights to three children were terminated, based, inter alia, upon findings that the mother was mentally ill and the father mentally deficient. Both parents remain incapable of providing adequate parenting by reason of impairment of emotional, mental, and psychological condition and abusive use of alcohol.

"2. The parents have failed to provide a minimally adequate environment to meet the child's physical, mental and psychological needs.

"3. The parents are not amenable to treatment which would enable them to provide adequate care to the child within the foreseeable future.

"4. The parents have failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that it appears reasonable no lasting adjustment can be effected.

"Wherefore, the State seeks the termination of their rights as parents."

The deputy who went to the Chapman's home said the house was "filthy," with cans and dirty dishes piled up in the kitchen, food spilled on the floor, unwashed bedclothes in the bedroom and a bad smell everywhere. He said that there were dirty diapers in what he took to be the child's room and that the child, who was at a neighbor's, was also "filthy." He said both parents were drunk the evening he was there.

The state's main witness was the neighbor who had called the police to the home. She testified that she had known the parents for seven years, that they drank beer "a lot" and that she heard them fighting about once a month. She testified that there were always dirty dishes and food laying around the house and that the child was usually dirty. She related two incidents in which she said the child had been improperly cared for: once, during the winter, the child crawled out of the Chapman's back door and into the neighbor's back door, a distance of ten feet, clad only in a diaper. This was the only instance, she said, in which she had ever seen the child unattended. The second incident related was an occasion on which Mrs. Chapman took Diane for an hour's bike ride in cold, rainy weather and the child was severely chilled when she returned. This neighbor also testified that she had once seen Mr. Chapman choking the child.

The neighbor's 9 1/2 year old daughter testified that there were dirty diapers and bugs in the house and that she had once seen Mr. Chapman, when he was drunk, try to pour beer down the child's throat. Another neighbor testified the mother rode her bike in the rain and cold with the child mounted in a bike seat behind her. Mrs. Chapman's brother testified the parents "possibly had a drinking problem." The psychologist who testified had not examined the Chapmans. The only psychological report in evidence was an evaluation of Diane which found her to be mildly retarded with "significant delays in communication skills, motor development and practical skills for daily living."[3]

---

[3] This intellectual evaluation, compiled by a psychologist at Emanuel Hospital, was done when Diane was 3 years and 9 months old. It found she performed at the 2 year 11 month level on the Stanford-Binet exam, functioned at the 2-2 1/2 year level in motor and "self-sufficiency" skills and at approximately the 3 year level in communication skills.

274

■    This court has said repeatedly that for termination to occur there must be a showing of a present failure properly to perform the parenting role. *State ex rel Juv. Dept. v. Kramer,* 34 Or App 1013, 1017, 580 P2d 211 (1978); *State ex rel Juv. Dept.v. Wyatt,* 34 Or App 793, 797, 579 P2d 889, *rev den* 283 Or 503 (1978); *State v. Blum,* 1 Or App 409, 417, 463 P2d 367 (1970). In considering termination, a court is required by ORS 419.523(2) to find, not only present conduct or conditions seriously detrimental to the child, but also that such conduct or conditions are not likely to change. In determining that the harmful conduct cannot be corrected, the termination statute provides that the court *shall* consider any lack of effort or failure on the part of the parents to make a lasting adjustment *"after reasonable efforts by available social agencies* for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."* (Emphasis supplied.) ORS 419.523(2)(e).[4] We said in *State v. Blum, supra,* that the parents must be presently unable, *even with the aid of social agencies,* properly to care for the child. 1 Or App at 417.

■    Even if we were to find that the parents' conduct and conditions of the family home reported in this case were "seriously detrimental" to the child,[5] the CSD caseworker assigned to the Chapmans freely admitted that since Diane had been taken from them, CSD had offered no

---

[4] Compare *State ex rel Juv. Dept. v. Darnell,* 49 Or App 561, 619 P2d 1349, *rev den* 290 Or 551 (1980), finding that, where the mother's parenting abilities were given a positive evaluation, CSD's failure to recommend parenting classes or counseling did not mean the agency had not made reasonable efforts to help her, and *State ex rel Juv. Dept. v. McDaniel,* 46 Or App 65, 610 P2d 321 (1980), where there was a specific finding that no amount of cooperation by a retarded father or effort by CSD would offer any reasonable possibility that the child could be permanently reintegrated into the home.

[5] It is, in fact, unlikely that we could so find. The record shows that prior to the incident in May, 1980, CSD had had no contact with the child at all except for the services of a home health nurse, who gave encouraging reports on the family's progress during the first six months of the infant's life. There was considerable testimony favorable to the parents. All the witnesses agreed the child had never been injured, ill or, except for the one "back door crawl" event, unattended. Even the next door neighbor, who was generally hostile, particularly to Mrs. Chapman, testified that Diane "had to be the healthiest kid in the city," and that she believed Mr. Chapman could take adequate care of her if he would "straighten up." Another neighbor and Mrs. Chapman's brother, who handled shopping and other affairs for the family, testified Diane was well loved and taken care of, well-groomed and happy. Their testimony and the family photo albums entered into

services, suggestions, encouragement, training or any advice of any kind to the parents to enable them to develop skills to care for the child properly. The parents testified that at the time of the hearing they had begun to receive alcohol counseling and that they wanted the chance to attend parenting classes or counseling sessions in order to have their daughter returned. The father testified he would "do anything."

· On the record before us, we find the trial court acted precipitously in terminating the Chapmans' parental rights to their daughter. In the total absence of efforts by social agencies to help the parents improve their parenting abilities, we cannot find the state has shown "substantial certainty that the parents will not be able to perform that role with minimal adequacy," *State ex rel Juv. Dept. v. Wyatt, supra,* 34 Or App at 797, if they are provided with assistance. *State v. Blum, supra.*

■ ■ It is not the role of the court to interfere with the rights of the natural parents because there may be, somewhere, an environment which might better allow the child to maximize her potential. *See State v. McMaster,* 259 Or 291, 404, 486 P2d 567 (1971). Neither are natural parents to be presumed unfit because of mental deficiency or mental illness. We note, as we did in *State ex rel Juv Dept. v. Wyatt, supra,* that our refusal to allow termination does not mean that the parent-child relationship cannot be closely supervised. 34 Or App at 799. The order terminating the Chapmans' parental rights in Diane is reversed.

Reversed.

---

evidence show that she had many toys, including a tricycle, a truck and a wading pool. Her father testified she had three meals every day. In response to hypothetical questions, the psychologist who testified said that, with support, an individual with the father's IQ could care adequately for a child and that medication and parenting programs were available to help schizophrenics in becoming effective parents.