Argued and submitted September 7, affirmed as to Simmons and reversed as to Pennington October 24, 1990, Simmons' reconsideration and Juvenile Department's reconsideration denied January 16, both petitions for review denied February 19, 1991 (311 Or 166)

In the Matter of
Amanda Renee Pennington,
Krystle Annie Pennington
and Kristen Justine Simmons, Children.

STATE ex rel JUVENILE DEPARTMENT OF
BENTON COUNTY
and Children's Services Division,
*Respondents,*

*v.*

Lora Jean PENNINGTON
and Shannon Troy Simmons,
*Appellants.*

(JV90-0280; CA A64252)

799 P2d 694

Jad Lemhouse, Corvallis, argued the cause and filed the brief for appellant Lora Jean Pennington.

Steven H. Gorham, Salem, argued the cause and filed the brief for appellant Shannon Troy Simmons.

Diane S. Lefkow, Assistant Attorney General, Salem, argued the cause for respondents. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

EDMONDS, J.

Riggs, J., dissenting in part; concurring in part.

## EDMONDS, J.

Mother, Lora Pennington, and father, Shannon Simmons, separately appeal the termination of their parental rights to their three children. Our review is *de novo,* ORS 419.561(4); ORS 19.125(3), giving due regard to the findings of the trial court, which had the opportunity to observe the witnesses. *State ex rel Juv. Dept. v. Maves,* 33 Or App 411, 576 P2d 826 (1978). We affirm the termination of father's rights and reverse the termination of mother's rights.

Our review of the record persuades us that the state has shown by clear and convincing evidence that father's parental rights should be terminated.

As to mother, Children's Services Division (CSD) initially became involved with her in 1985, when she had only two children. In 1987, it attempted to provide "parenting" classes for her and early intervention services for her older child, who appeared to be developmentally delayed. Initially, mother did not respond to the offer of services. Later, CSD workers were able to provide some services to her and the children; however, the family moved so often that it was difficult for CSD to maintain services. CSD workers who met with the family expressed concerns regarding mother's parental skills and the older daughter's apparent developmental problems. Particularly, they were concerned about mother's ability to bottle-feed the younger child and her negative interactions with the older child.

In March, 1988, the children were removed from mother's home in Benton County and placed in CSD's temporary custody, after allegations that father had sexually abused one of the children. In August, 1988, mother and CSD entered into a service agreement to enable her to regain custody of them. The agreement required mother to visit her children regularly, submit to a psychological examination, obtain services from the local Mentally Retarded Developmentally Delayed (MRDD) program, establish a stable residence and improve her parental skills by working with a CSD homemaker. Mother satisfied several of the requirements of the plan; however, she failed to obtain MRDD services and made minimal progress in improving her parental skills. The children remained in CSD's custody.

At some point during that time, mother became pregnant. Fearful that CSD would take the newborn child from her

custody, she left the state. She returned to Coos Bay several months later and gave birth in March, 1989. Several days later, CSD took the baby into custody.

While mother was in Coos Bay, CSD offered her several services, including parent training classes, individual counseling and homemaker services. She made and kept only one appointment with a counselor and a homemaker; otherwise, she did not use the services. She moved to her father's home in Douglas County in May, 1989. Between December, 1988, and June, 1989, she had no contact with her two older children. She contacted CSD on June 2, 1989, to arrange a visit with them. CSD arranged four visits from June through August. One of them was postponed because of the children's illness, and mother canceled another. She kept the other two appointments. On August 24, 1989, CSD filed a petition to terminate mother's parental rights under ORS 419.523(3) and (4).[1]

---

[1] ORS 419.523(3) provides:

"The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(b) Conduct toward any child of an abusive, cruel or sexual nature.

"(c) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(d) Physical neglect of the child.

"(e) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

ORS 419.523(4) provides:

"The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

"(a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(b) Failure to maintain regular visitation or other contact with the child

In June, 1989, mother went to the Douglas County Adult and Family Services Division (AFSD) office to obtain food stamps and other assistance. She was referred to the local MRDD program. With the help of her MRDD caseworker, mother obtained her own apartment in December, 1989, and established a regular visitation schedule with her children. She continued to meet with her caseworker and obtained Supplemental Security Insurance benefits, food stamps and a medical card. Shortly before trial in February, 1990, she developed a plan to enable her to regain custody. It would require mother to participate in a Semi-Independent Living Program, to increase her competency in a variety of homemaking skills and to improve her interaction with social service providers.

The two older children have been in foster care since March, 1988, and the third child, since March, 1989. When they were taken into custody, the oldest was four and one-half years old; her speech was nearly unintelligible and she was angry, defensive and seriously lacking in interpersonal skills. She also had a problem with gorging and ruminating her food. The second child, then ten months old, was described as "passive" and "negative." There was testimony that those two children have improved markedly in the foster homes. The oldest girl has stopped gorging and has improved intellectually, and the second child now is described as "bubbly, sparkly, and extremely bright * * *." The youngest is said to be a "bright little girl."

The state argues that mother is unfit to be a parent for her children because she failed to protect them from an environment of abuse and failed to attend to their ordinary and special needs. It asserts that, even with the help of homemaker services and parenting classes, "mother has not made any changes in her life that would enable the children to return to her home in the foreseeable future." Mother argues that she has substantially changed her conduct and living conditions since June, 1989, and that there now exists a high

---

which was designed and implemented in a plan to reunite the child with the parent.

"(c) Failure to contact or communicate with the child or with the custodian of the child. In making this determination, the court may disregard incidental visitations, communications or contributions."

probability of successful re-integration of her children into her home.

Dr. Mesberg, a psychologist, performed an AFSD employability evaluation during the summer of 1989. At trial, he testified that mother appeared to be "somewhat slow intellectually." However, he went on to state that, "if she was subjected to training experiences, * * * she would be able to absorb a substantial amount of the material that's presented to her." Further, on the basis of interviews that he conducted in February, 1990, he testified that mother's slow intellect would only "minimally" interfere with her abilities as a parent. Regarding her change in attitude and behavior, Mesberg stated, "She [is] really beginning to understand that she has good access to some real good resources." He believes that her case is "workable."

Mother's MRDD counselor also testified on her behalf. He testified that mother's attitude has changed from denial to recognition that she needs help to provide proper care for her children. He stated that mother should be capable of caring for her children "under a graduated program with supervision and support and continued training" and that, if she were to regain custody, she would stick to the plan and would be a good parent. He concluded that it was probable that the children could be reintegrated into mother's home within twelve to eighteen months.[2] Mother's MRDD case

---

[2] The dissent states:

"Even the most optimistic estimates of mother's potential for successful re-integration of the children into her home is that it will take at least 12 to 18 months to integrate *each* child, one at a time." 104 Or App at 203. (Emphasis supplied.)

This assertion is not supported by the record. On cross-examination, mother's MRDD counselor testified:

"Q Mr. Pratt, you indicate that in your opinion [mother] may be able to parent somewhere down the line?

"A Uh-huh.

"Q How far down the line, how long is this going to take?

"A * * * [S]he could take a child at a time, with continued supervision, support, and I would estimate that it could take twelve to eighteen months.

"Q When could it start, in twelve to eighteen months?

"A For reintroduction of the children, I would feel like she would be ready in the next several months, you know, before September. That's the objective, the ultimate deadline of September.

"* * * * *

"Q That's assuming that no barriers jump up in the meantime, would that be

manager agreed. He testified that, "in due time," the plan would enable mother to take care of and support her children, that she had followed his directions, that he believes she is likely to follow through on the plan and that he believes mother would willingly cooperate to regain custody of her children.[3]

The state offered the testimony of several CSD employees that mother has failed to avail herself of CSD services and had, as recently as the fall of 1989, shown little improvement in the development of her parental skills. One caseworker testified that mother did not follow up on a July, 1987, offer of early intervention services for the oldest child. Another testified that mother failed to follow up on a referral to MRDD in November, 1988. Evidence was presented showing that mother angered easily, did not interact with her children appropriately and resisted advice on how to bond with them. The state also offered the testimony of Dr. Sweet, a psychologist, who examined mother in October, 1988. He concluded that she is mildly mentally retarded, has a dependant

---

right?

"A I think that would mean assuming no barriers, because there are going to be difficulties in the process of learning, training, there's going to be relearning — not relearning, but consistent and repetition in production of the same thing in order to develop a consistent response.

"Q So at your best estimate we're looking at something over two years, two and a half years at the outside?

"A I think [mother] has a potential to beat that. That's why I am saying twelve to eighteen months.

"Q After September of 1990?

"A Oh, no, I mean twelve to eighteen months from now.

"Q That she could have all of her children back with her?

"A That's through [a] graduated and well supervised program, I think it's possible.

"Q It's possible. We got to talk about probability. Could you talk to us about what's probable?

"A If we do the job I think we can, [mother] has demonstrated to me, I think it's probable."

[3] The state argues that the testimony of mother's experts should be given no weight, because they have not seen mother interact with her children. However, Sweet, who examined mother on only one occasion in 1988 on behalf of CSD, conceded the possibility of mother's ability to become an adequate parent. Given the duration of contacts that mother's witnesses have had with her, and their proximity to the date of trial, we consider the testimony of mother's experts to be probative on the issue of whether integration of the children into mother's home is improbable in the foreseeable future.

and schizoid personality disorder and would have difficulty providing her children with a stable and nurturing environment. He testified that mother's prognosis is "guarded" because of her "low cognitive ability and her difficulty understanding concept[s]." On cross-examination, however, he acknowledged that there is a possibility that mother would be an adequate parent with certain training and safeguards and did not specifically recommend termination of her parental rights.

To terminate parental rights under ORS 419.523, the state must prove that the parent presently is unable to meet the physical and emotional needs of the child *and* that the present inability is unlikely to change in the foreseeable future. *State ex rel Juv. Dept. v. Herman,* 69 Or App 705, 709, 687 P2d 812 (1984). The burden of proof is by clear and convincing evidence. ORS 419.525(3).

The evidence fails to convince us under that standard. Although mother was unable to care for her children at the time of the hearing, we are not convinced that integration into her home is improbable in the foreseeable future. The state's witnesses offered testimony about events that, for the most part, had occurred well over a year before the termination hearing. Dr. Sweet met with mother on only one occasion. In contrast, mother's expert witnesses had more contact with her over a longer period of time and credibly testified about her recent progress and the probability of reintegration of her children into her home within the foreseeable future. As we said in *State ex rel Juv. Dept. v. Wyatt,* 34 Or App 793, 798, 579 P2d 889, *rev den* 283 Or 503 (1978):

> "On *de novo* review, we are not independently satisfied that the conduct and conditions of the mother are not likely to change. Indeed, the evidence shows that they have started to change already * * *. An adjustment has begun; the mother is entitled to a chance to show it is permanent."

The state also argues that mother will require long-term, and perhaps even lifelong, assistance and counseling. *See State ex rel Juv. Dept. v. Scott,* 100 Or App 172, 785 P2d 779 (1990). Unlike in *Scott,* mother does not suffer from a severe mental disorder but is only mildly mentally retarded, which suggests that she will not be wholly reliant upon state agencies to meet the needs of her children. She does not seek a

surrogate parental arrangement; rather, she seeks to develop, with the assistance of the state's social service agencies, her own skills and talents to enable her to take care of her children. Mother should be given an opportunity to pursue those resources.

■ We must address the state's assertion that it would not be in the best interests of the children for mother's parental rights to continue. The testimony is uncontradicted that all three children have progressed remarkably while they have lived with foster parents. However, we cannot uphold the termination of mother's rights simply because another environment might better allow her children to maximize their potentials. *State ex rel Juv. Dept. v. Chapman,* 53 Or App 268, 275, 631 P2d 831 (1981). Because the state has failed to show by clear and convincing evidence that mother will not be able to perform her role with minimal adequacy, *State ex rel Juv. Dept. v. Wyatt, supra,* 34 Or App at 797, the order terminating her parental rights is reversed.

Affirmed as to Simmons; reversed as to Pennington.

**RIGGS, J.,** concurring in part; dissenting in part.

I agree with the majority that father's parental rights as to all three children should be terminated. However, I do not agree with the majority that mother's rights should not also be terminated.

The majority opinion points out the history of mother's unwillingness to obtain the skills necessary to be an adequate parent, notwithstanding the many referrals and attempts by state agencies to provide such services without success. The majority focuses on mother's conduct, commencing in June, 1989, as a reason to conclude that she has reversed her long history of inattention toward the children and has finally made the decision to avail herself of services that might make her at least a minimally adequate parent. The majority is wrong in characterizing her most recent minimal effort as anything other than what it is—too little and too late. CSD decided in June, 1989, to file a petition for termination of mother's parental rights and finally did so on August 24, 1989. As I read this record, mother's efforts to present herself as a minimally adequate parent commenced in the summer of

1989, approximately coincident with the termination petition's filing. Mother has been diagnosed as mildly mentally retarded and suffering a mixed personality disorder, combining both dependent and schizoid personalities. Personality disorders are very resistent to treatment, according to Dr. Sweet, a psychologist who evaluated mother in 1988. He opined that effective treatment requires "a lot of recognition out of the client," along with insight, understanding, motivation and a lot of work, which characteristics are totally lacking in mother on this record. Even the most optimistic estimates of mother's potential for successful re-integration of the children into her home is that it will take at least 12 to 18 months to integrate each child, one at a time.[1] If this estimate is correct, one or more of these children will continue in out-of-home placement for the next two to three years.

The majority engages in wishful thinking when it overlooks mother's long history of mistreatment, poor care and physical and emotional abandonment in favor of the "guarded" estimates of several witnesses[2] that she has made some improvements during the period after the filing of the termination petition. Instead of being seduced by mother's half-hearted improvements and the natural desire to give her "one more chance," the majority should consider that mother's intellectual, emotional and psychological deficits, coupled with a long history of poor performance as a parent, make it unlikely that the children can be integrated into her home within a reasonable time. These children should not have to wait any longer. Given this record, to the extent that they have the potential for healthy, happy lives with caring, nurturing parents, they deserve those opportunities.

I would terminate as to both parents.

---

[1] The therapist who provided that estimate further testified that the 12 to 18 month timetable assumed that it would take an "intensified effort" and that "no barriers" would arise during the re-integration process.

[2] I disagree with the majority's reliance on Dr. Mesberg's statement that mother's mental retardation and personality disorder would only "minimally" interfere with her efforts to achieve better skills as a parent. Mesberg also testified that he did not do a comprehensive psychological evaluation and that his "involvement with [mother] has been very limited and circumscribed, just with regard to the employability issue * * *." His evaluation was "[o]nly very indirectly" concerned with mother's parental ability; he never saw her with the children, never reviewed the CSD records and was unaware of her agency history with the agency.