Argued and submitted April 20, reversed June 28, 1995, petition for review denied
November 21, 1995 (322 Or 360)

In the Matter of
Acacia Inez Brady-O'Neal, a Child.

STATE ex rel
CHILDREN'S SERVICES DIVISION,
*Respondent,*

*v.*

Michelle Marie BRADY,
*Appellant.*

(93-331; CA A87207)

899 P2d 691

George W. Kelly argued the cause and filed the brief for appellant.

Harrison Latto, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Michelle Brady (mother) appeals from a judgment terminating her parental rights to her daughter (child). ORS 419B.500.[1] We review *de novo*, ORS 419A.200, and reverse.

The issue here is whether a mentally impaired mother lacks the capacity to care for her special needs child. The specific question is whether Children' Services Division (CSD) has proved by clear and convincing evidence that mother "presently is unable to meet the physical and emotional needs of [child] *and* that the present inability is unlikely to change in the foreseeable future." *State ex rel Juv. Dept. v. Pennington*, 104 Or App 194, 201, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991) (emphasis supplied). *See* ORS 419B.504.[2]

Child was born two months prematurely on April 21, 1993. She weighed only two-and-a-half pounds at birth and suffered from life-threatening medical conditions, including severe heart and lung problems. Because of those conditions, child spent the first 15 weeks of her life in the neonatal intensive care unit at Sacred Heart General Hospital in Eugene.

---

[1] The judgment also terminated the parental rights of child's father. He does not appeal.

[2] *ORS 419B.504 provides, in part:*

"The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"* * * * *

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

The judgment adopted additional, alternative grounds for termination. However, it is obvious from the record, including the trial court's oral comments, that ORS 419B.504 was the primary basis for termination.

Mother was 18 when child was born. She was, and is, a person of low average intelligence, who exhibits certain mental and psychological difficulties, which are addressed below. She was a runaway in her early teens, dropped out of school in the eleventh grade, and experienced a series of abusive relationships, including, most recently, with father. Mother met father in 1990, when she was homeless, and their relationship was volatile and periodically violent.

Despite the instability in her life, mother visited child at the hospital daily, spending hours with her. Mother met with the nursing staff to discuss child's special needs, and expressed her commitment and determination to learn and to be a good parent. Nonetheless, following an altercation between mother and father, which required the intervention of hospital security, hospital staff became concerned that the parents might be incapable of meeting child's needs and, consequently, contacted CSD.

On June 6, 1993, when child was six weeks old, a CSD intake investigator contacted mother and father to determine if they could care for child on her release from the hospital. After the initial interview, the investigator recommended that the couple attend psychological evaluations and CSD-sponsored men's and women's domestic violence groups. CSD did not offer mother any other assistance or training in parenting a special needs child.[3]

At CSD's insistence, Dr. James Ewell conducted a psychological examination of mother on June 22, 1993. In interviewing mother, Ewell learned that she had sustained substantial head injuries, including a contusion to the front part of her brain, in an automobile collision when she was 14. Immediately after that collision, mother had experienced a seizure in the emergency room and had been hospitalized for 11 days. After being released from the hospital, she had continued to experience seizures and was placed on appropriate medication. Nonetheless, mother had continuing problems with concentration, memory, and vision, and had experienced blackouts and anxiety attacks.

---

[3] Mother attended the CSD women's violence group between September 1993 and August 1994, but her participation was sporadic.

Ewell also administered several diagnostic tests, which indicated that mother had low average intelligence and impaired empathy, problem solving, and psychological sensitivity. Based on those results and the interview, Ewell concluded that mother has an irreversible condition known as organic personality syndrome with passive-aggressive features:

"An Organic Personality Syndrome is defined by a persistent personality disturbance involving affective instability, recurrent outbursts of aggression or rage that are grossly out of proportion to any participating psycho/social stressors, markedly impaired social judgment, apathy and indifference. * * *

"Passive-aggressive personality disorder is characterized by * * * pervasive patterns of passive resistance to demands for adequate social and occupational functioning. Individuals with this disorder procrastinate, become irritable or argumentative when asked to do something they do not want to do, and often avoid obligations by claiming some form of deficit."

Ewell concluded that mother lacked the skills to care for child on her release from the hospital:

"*In answer to [the CSD investigator's] specific questions, I do not believe [mother's] current psychological condition would allow her to commit to taking adequate care of her daughter.* I do not believe she would be able to adequately assess [child's] needs, or respond appropriately in times of emergency. Her learning ability and follow through seem to be impaired. I also doubt that [mother] would be able to adequately manage her anger so that [child] would not be exposed to domestic violence. At the time of this assessment, [mother] had not yet demonstrated an ability to maintain a home setting that would be adequate for her daughter's specialized care.

"In many ways, [mother] must be seen as an adolescent who herself, is still in need of parenting. Her problem-solving abilities, 'common sense,' and psychological sensitivities are impaired. She will probably require extended assistance and guidance in establishing herself as an adult. Her ability to parent a 'fragile infant, who will require very specialized care' would seem to be severely lacking. I therefore could not recommend that [child] be sent to live with [mother] once the child is released from the hospital.

*"Prior to [mother] assuming responsibility for her daughter, I believe she will need to complete anger management classes, parenting classes and additional educational programs designed to increase her skills and abilities. She may also need to live with [child] in a foster home-like setting, wherein an experienced and responsible adult caregiver can provide constant supervision/guidance.* Long-term psychotherapy for [mother] would also be indicated at this time." (Emphasis supplied.)

Following Ewell's evaluation, in July 1993, CSD petitioned the circuit court to assume jurisdiction over child. CSD's petition alleged that child's welfare was endangered because of her special medical needs and because mother "has limited mental abilities and has been diagnosed as having Organic Personality Syndrome with Passive-Aggressive Features." Mother admitted those allegations and, on August 26, 1993, the court found child to be within its jurisdiction.

On August 6, 1993, child was released from the hospital into the care of Erika Hatzel, a foster parent with experience in caring for medically needy infants.[4] Three weeks later, she developed complications that necessitated her return to the hospital for an additional six weeks. Thereafter, her condition stabilized and improved so that she no longer required a heart monitor and special medication for lung problems. Nonetheless, Hatzel was required to monitor child constantly for shortness of breath, discoloration, and concavity of her chest.

After child was placed in foster care, mother's access and interaction was limited to two one-hour supervised visits per week at CSD's offices. Mother attended all visitations on time, without fail, and made up the ones that were canceled because of child's periodic health problems. While there, mother used all of the available time to play with child, and child appeared to enjoy being with mother.

In October 1993, CSD requested that Margaret Veltman of the BASE program[5] assess the parents' skills and

---

[4] The record does not disclose the basis on which child was placed in CSD-sponsored foster care several weeks before the trial court entered its findings and order of jurisdiction. In any event, the parents did not object to that placement.

[5] Veltman testified at the termination hearing that the BASE program is a "combination early intervention parent training program that's a collaboration between [CSD] and the early intervention program at the University of Oregon."

abilities. CSD expected that Veltman, in evaluating mother's parenting skills, would assess mother's "concrete" ability to respond appropriately to child's diverse needs. Veltman monitored the interaction between child and her parents during three one-hour visitations in November and December 1993. She determined that, although mother was more successful than father in engaging child, both had difficulty reading child's "subtle social-communicative cues." She concluded:

> "[Mother and father] are young parents who show an obvious interest in parenting their infant, but who, despite their efforts, are currently unable to meet her needs for interaction. The [child] is a medically fragile, premature infant who will require very specialized care if she is expected to thrive and reach normalcy."

Veltman did not, however, specifically assess mother's "task solving" ability to discern and respond to child's special needs.

In January 1994, after receiving Veltman's report, CSD decided to petition for termination of the parents' rights. At that time, child was eight months old. Once CSD made that decision, it offered neither parent any further assistance or support in acquiring the skills needed to care for their special needs child. In particular, CSD never offered the educational and training assistance identified in Ewell's report. As the CSD caseworker explained, CSD "did not feel the parents were capable with their limitations to parent this child in the foreseeable future and, therefore, we did not offer further services at that point."

In April 1994, CSD filed the petition, asserting several grounds for termination.[6] Despite CSD's lack of assistance — or perhaps because of it — mother, on her own

---

[6] In addition to allegations based on ORS 419B.504, n 2 *supra*, the allegations in the petition corresponded to ORS 419B.506, which provides, in part:

"The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

"(1) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others."

initiative, undertook a variety of "self-help" efforts to improve her life generally and her capability as a parent, particularly. Mother (1) contacted the Young Parents Program (administered by a local church) and began individual counseling, as well as parenting classes that included infant CPR; (2) took substantial steps to terminate her relationship with father, including obtaining a restraining order against him;[7] (3) pursued a course of study towards attaining a general equivalency diploma; and (4) provided volunteer services at a senior center.

The termination hearing was held in October 1994. At that time, child was 18 months old. Her medical condition had improved, but her coloration, chest, and breathing still needed to be checked three to four times a day. Child walked with difficulty and still did not speak in any identifiable fashion. She continued to be an "extremely fussy" child who woke up several times each night, was uncomfortable with strangers and was extremely sensitive to noise.

In conjunction with the facts previously described, five aspects of the termination hearing are especially pertinent: First, CSD relied almost exclusively on the Ewell and Veltman evaluations to establish mother's present and future incapacity to care for child. Ewell's report had been generated 16 months earlier; Veltman's, 10 months earlier. Although Ewell defended his original diagnosis, Veltman conceded that she was not capable of rendering an informed opinion as to mother's ability to care for child at the time of the hearing or in the foreseeable future.

Second, Robert Carter, mother's counselor at the Young Parents Program since May 1994, testified concerning mother's psychological condition. Carter disputed Ewell's diagnosis of an organic personality syndrome and opined that, rather than being organic, mother's psychological disorders stemmed primarily from a post-traumatic stress disorder, which, in turn, flowed from her history of abusive relationships. In Carter's view, mother's stress disorder was amenable to treatment. Although Carter testified that it

---

[7] Mother and father continued to have occasional contact, particularly in the context of visiting child. Although one encounter escalated into an altercation, the rest were unremarkable.

would take mother at least two years to overcome her condition, he believed that she had made substantial progress in handling stress, managing her anger, and developing self worth, and that, with continued treatment, the likelihood of overcoming the effects of her stress syndrome would improve "immeasurably."

With particular reference to mother's ability to care for child, Carter acknowledged that mother had poor organizational skills, which could materially impair her ability to care for a child with diverse special needs. However, Carter testified that mother's organizational deficits were related to her post-traumatic stress disorder and that, as the symptoms of that disorder abated through treatment, mother's organizational skills were improving and would continue to improve.

Third, child's pediatrician, Michael Eustis, testified as to her current medical condition. Eustis stated that, although child's heart and lung problems were "by and large resolving," they would still require careful monitoring, which could not be reduced to a "checklist" form. Eustis observed that, although child's medical problems were decreasing, her developmental needs would increase in the future. He was, however, unable to describe those future needs with particularity: "It's so wide open and so uncertain right now, I can't tell you what precisely is going to be needed."

Fourth, mother testified simply, but cogently, about child's special needs and her ability to meet those needs. Under searching cross-examination, her responses were clear, direct, and thoughtful.

Fifth, and finally, CSD did not present any evidence of an imminent, compelling need to terminate mother's rights, rather than maintaining the status quo, including continuing foster care. There was no evidence that child was immediately adoptable, or that her prospects for adoption would be materially prejudiced if mother's rights were not immediately terminated. Indeed, Eustis testified that, on a one to ten scale of adoptability, with ten being highly adoptable, child is a "two." The CSD case worker concurred that she "would have to really do some recruiting" to find a

suitable adoptive family. Child's foster mother, Hatzel, testified that she would be willing to continue in that role "as long as she wants me to keep her, [and] CSD wants me." She was ambivalent as to any interest in adopting child.

The trial court granted CSD's petition. In a letter opinion, the court noted that it was "influenced a great deal" by Ewell's report and opinion that when mother "was alone and responsible for the supervision of [child], he believed the responsibility would be overwhelming to her." The court subsequently issued a judgment that based termination on a variety of alternative grounds, including not only mother's inability to provide care because of her mental deficiency, but also mother's "lack of effort * * * to make return of the child possible"; mother's failure to provide, or attempt to provide, "care, attention, and love"; mother's failure to pay a reasonable portion of child's medical care and foster care; and mother's "failure to implement a plan designed to lead to the integration of the child into the parent's home."

On *de novo* review, we disagree with the trial court both on its principal grounds for termination, ORS 419B.504(1), and on the alternative grounds. Accordingly, we reverse the judgment of termination.

■ Our disposition rests, ultimately, on the conjunctive character of the state's burden under ORS 419B.504. The state must prove, by clear and convincing evidence, that a parent is presently unable to meet a child's needs, *and* that

"integration of the child into the home of the parent * * * is improbable in the foreseeable future due to conduct or conditions not likely to change." ORS 419B.504; *Pennington,* 104 Or App at 201.

■ Here, the question of mother's present ability to meet child's needs is close and difficult. Although child's medical condition has stabilized and mother's circumstances appear to have improved, the testimony of Ewell, Veltman, and Eustis might well support a conclusion that mother is not presently able to act as child's primary caregiver. Eustis' testimony regarding child's "extraordinary" developmental needs is particularly pertinent in that regard. We note, moreover, that even mother's counselor, Carter, acknowledged

reservations about her present abilities, especially with respect to her organizational skills.

However, regardless of mother's present capabilities, the state failed to prove by clear and convincing evidence that child's integration into mother's home is "improbable in the foreseeable future due to * * * conditions * * * not likely to change." ORS 419B.504.

■ Mother has never had a meaningful opportunity to develop and demonstrate parenting skills. Child remained in the hospital after birth and was placed directly in foster care. Thereafter, mother's contact with her was limited to two one-hour supervised visits per week at CSD's offices. Veltman, the BASE program evaluator, acknowledged that such restrictive contact prevented mother, a first-time parent, from acquiring "hands on" skills and experience and from building on that base of experience in interacting with child.

CSD's principal evaluator, Ewell, acknowledged that, with appropriate guidance and training, mother might ultimately assume primary responsibility for child. Nonetheless, except for referring mother to the women's violence group, CSD never provided such assistance. *Accord* ORS 419B.504(5) (parent's failure "to effect a lasting adjustment after reasonable efforts by available social agencies" may justify termination). Once CSD decided to seek termination, when child was eight months old, it provided no further support. Notwithstanding CSD's lack of support, mother demonstrated her commitment to child by finding, and participating in, individual counseling and basic parenting classes, by pursuing a GED, and by providing volunteer services.

■ Mother's circumstances are analogous to those in *State ex rel Juv. Dept. v. Chapman*, 53 Or App 268, 274-75, 631 P2d 831 (1981), which reversed a termination order because, in part, "CSD had offered no services, suggestions, encouragement, training, or any advice of any kind to the parents to enable them to develop skills to care for the child properly." Indeed, mother's position is more compelling than that of the parents in *Chapman*, because here CSD's retained expert, Ewell, recommended that mother be given such assistance, and CSD disregarded that recommendation. *Accord*

*State ex rel Juv. Dept. v. Scott*, 100 Or App 172, 176, 785 P2d 779 (1990) (affirming termination order where mentally retarded mother, who had received education and training support from responsible social service agency, admitted that she could not care for child herself, but sought "permanent full-time surrogate parenting for her child through mutual foster care"); *State ex rel Juv. Dept. v. McDaniel*, 46 Or App 65, 70, 610 P2d 321 (1980) (reversing denial of termination where "no amount of effort by CSD and cooperation by the [severely mentally retarded] father would offer any reasonable possibility that the child could be permanently reintegrated into the home").

Given those circumstances, mother's commitment to child, and her undeniable determination to be a good parent, we are not " 'independently satisfied that the conduct and conditions of the mother are not likely to change.' " *Pennington*, 104 Or App at 201 (quoting *State ex rel Juv. Dept. v. Wyatt*, 34 Or App 793, 798, 579 P2d 889, *rev den* 283 Or 503 (1978)). In both *Pennington* and *Wyatt*, we granted parents "second chances" by reversing termination orders, because the parents had begun to make progress and were "entitled to a chance to show it is permanent." *Wyatt*, 34 Or App at 798; *see Pennington*, 104 Or App at 201. Here, mother has never been given even a first chance. She deserves that opportunity.

■       Finally, we reject the trial court's alternative grounds for termination. Those grounds cannot be reconciled with the record before us, which amply demonstrates mother's love for child, her determination to acquire needed parenting skills and to improve her life generally, and her commitment to cooperate fully with all reasonable efforts to integrate her daughter into her home.

Reversed.