Argued and submitted November 10, 1998, reversed and remanded for further proceedings September 15, 1999

In the Matter of
Marcos Antonio Mendez, a Minor Child.

STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Lisa MENDEZ,
aka Lisa Diaz,
*Respondent.*

(6711J; CA A101560 (Control)

In the Matter of
Patricia Margarita Mendez, a Minor Child.

STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Lisa MENDEZ,
aka Lisa Diaz,
*Respondent.*

(6712J; CA A101561)

In the Matter of
Armando Diaz, aka Armando Mendez, a Minor Child.

STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Lisa MENDEZ,
aka Lisa Diaz,
*Respondent.*

(6713J; CA A101562)

In the Matter of
Eloy Carlos Diaz, aka Eloy Carlos Mendez, a Minor Child.
STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Lisa MENDEZ,
aka Lisa Diaz,
*Respondent.*

(6714J; CA A101563)

In the Matter of
Valdemar Diaz, aka Valdemar Mendez, a Minor Child.
STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Lisa MENDEZ,
aka Lisa Diaz,
*Respondent.*

(6715J; CA A101564)

In the Matter of
Marcos Antonio Mendez, a Minor Child.
STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Arturo MENDEZ,
*Respondent.*

(6716J; CA A101565)

In the Matter of
Patricia Margarita Mendez, a Minor Child.
STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Arturo MENDEZ,
*Respondent.*

(6717J; CA A101566)

In the Matter of
Armando Diaz, aka Armando Mendez, a Minor Child.
STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Arturo MENDEZ,
*Respondent.*

(6718J; CA A101567)

In the Matter of
Eloy Carlos Diaz, aka Eloy Carlos Mendez, a Minor Child.
STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Arturo MENDEZ,
*Respondent.*

(6719J; CA A101568)

In the Matter of
Valdemar Diaz, aka Valdemar Mendez, a Minor Child.
STATE ex rel STATE OFFICE FOR SERVICES
TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Arturo MENDEZ,
*Respondent.*

(6720J; CA A101569)
(Cases Consolidated)

986 P2d 670

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

D. Olcott Thompson filed the brief for respondent Arturo Mendez.

Theresa M. Kohlhoff filed the brief for respondent Lisa Mendez, aka Lisa Diaz.

Before Landau, Presiding Judge, and Linder and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

■ The state appeals the trial court's dismissal of its petition to terminate the parental rights of mother and father to three of their minor children. Because the trial court granted mother and father's motions for dismissal before the close of all the evidence, we review "whether, on the record as a whole, the state introduced sufficient evidence to establish a *prima facie* case for termination of mother and father's parental rights."[1] *State ex rel SOSCF v. Cox,* 152 Or App 756, 763, 954 P2d 1277 (1998). We conclude that the state established a *prima facie* case and, therefore, reverse and remand for further proceedings.

■■ In December 1997, the State Office of Services for Children and Families (SCF) filed petitions to terminate the parental rights of mother and father to their two-year-old triplets.[2] SCF alleged, under ORS 419B.504 (1995),[3] that parents were unfit to parent. The petitions regarding mother and father contained substantially the same allegations, that parents were unfit due, among others, to "[p]hysical and emotional neglect of the children," and

---

[1] While not explicitly stated as a motion for dismissal under ORCP 54 B(2), the substance of the arguments, decision, and order indicate that the motion was considered under that rule.

[2] The petition also included the termination of parental rights to parents' four-year-old twins. During the pendency of this appeal, parents consented to the adoption of the four-year-old twins; thus we do not consider the allegations of unfitness as they relate to the twins.

[3] ORS 419B.504 (1995) provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"* * * * *

"(4) Physical neglect of the child.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

"[l]ack of effort to adjust the [parents'] circumstances, conduct or conditions to make return of the children to the [parents] possible, or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

To prove that mother and father's parental rights should be terminated, the state must establish by clear and convincing evidence that, by virtue of the above conditions or conduct, mother and father are presently unfit to parent their children and that the present inability is unlikely to change, making integration of the children into the parents' home improbable in the foreseeable future. *State ex rel Juv. Dept. v. Pennington,* 104 Or App 194, 201, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991). Once that is established, the state must also prove by clear and convincing evidence that the children's best interests will be served by termination of parental rights pursuant to ORS 419B.500. *State ex rel Juv. Dept. v. Beasley,* 314 Or 444, 452, 840 P2d 78 (1992).

Mother and father have seven children. The children subject to this proceeding are the three youngest children of mother. Their oldest children are twins, born in October 1992. Though they lived in foster care with their grandmother for their first four years, the twins were reintegrated into parents' home in 1996. The five-year-old twins were residing in parents' home at the time of the termination hearing. In 1993, mother gave birth to a second set of twins, who were released for adoption during the pendency of this appeal after spending all but a few months of their lives in foster care. The children at issue here, the triplets, were born in June 1995.

Concern for the well-being of the triplets began in March 1996, when their pediatrician, Dr. Dunbrasky, noted a marked decline in the triplets' growth. Dunbrasky, specially trained in the area of child development, noticed that each of the triplets' weight was below what was to be expected, based on their own prior performance. The decline was notable for several reasons. The triplets were born premature[4] and, at

---

[4] The medical testimony explained that prematurity is not uncommon with multiple birth pregnancies.

five-and-a-half months, Dunbrasky explained that each of the triplets had manifested the kind of excellent growth expected of premature infants. She also explained that children generally begin eating solid foods at four to six months and that the effect on growth of that transition generally manifests itself at nine months. Dunbrasky could identify no medical reason for the decline in growth at nine months but learned that mother and father no longer participated in the Women, Infant, and Children (WIC) program that provides free nutritional information, as well as food vouchers.[5] Dunbrasky encouraged parents to return to the WIC program. She began to monitor carefully the children's weight, height, and head circumference.

Dunbrasky was concerned enough in March to refer county health nurses to mother and father's home to take monthly weights of the triplets. By June 1996, the growth rate of all three children had declined further. Most disconcerting was the fact that the growth rate of each triplets' head circumference had also declined. Dunbrasky explained that the lack of expected increase in head circumference, which is a direct reflection of brain growth and development, demonstrated that the triplets were not receiving adequate nutrition to grow. Further medical testimony explained that the human body places a priority on brain growth; thus weight and height will be affected first—it is only when nutritional deficiency is severe that changes in brain growth and head circumference become evident.

In June 1996, Dunbrasky formally diagnosed the triplets with nonorganic "failure to thrive," a generic term meaning that a child is failing to grow at a normal pace. Causes may be either organic or nonorganic. Organic causes are chronic diseases or other problems prohibiting the absorption of food and calories. The nonorganic cause is lack of adequate nutrition. Consistent with Dunbrasky's diagnosis, evidence showed that, when the triplets were placed in an environment where they received adequate nutrition, their

---

[5] WIC is a federally funded program providing food, formula, and the like to qualifying women, infants, and children. *See* 42 USC 1786. The Mendezes were qualified to participate in the program.

bodies were able to absorb that nutrition and they were able to gain weight.

Dunbrasky notified SCF, who became involved in August 1996. SCF provided a wealth of services, including in-home instruction on nutrition and feeding techniques. Parents have had the assistance of caseworkers, family resource workers, WIC, county health nurses, doctors, Headstart and early intervention programs all with the goal of improving mother and father's skills at recognizing and providing for the basic needs of the triplets. For example, in September 1997, a family advocate at Headstart began making daily trips to parents' home to provide intensive instruction and assistance. SCF provided transportation services and other support for the family.

At the termination hearing, the medical experts agreed that the triplets failed to grow at a healthy rate and that their decreased rate of growth in head circumference indicated developmental failure that put them at risk for permanent developmental delay. As early as August 1996, Dunbrasky concluded that "these children are at risk for permanent developmental delay and are unsafe in their current environment." In October 1997, Dr. Boston, a specialist in children of small stature and in the failure to thrive medical condition, confirmed Dunbrasky's diagnosis of nonorganic failure to thrive. Boston further emphasized that the principle risk of failure to thrive is decreased brain development that often can never be fully remedied. He explained that the children were at risk for impingement on future intelligence, growth problems, and health problems such as increased incidents of minor infections. He was uncertain if the damage to the triplets was irreversible, but he was certain that the triplets had suffered severe damage that, if continued, would become permanent. Dunbrasky concurred and stated that if the triplets' failure to thrive continued, the children might not be able to live independently as adults. Consistent with that opinion is evidence that when the triplets were tested in late October 1997, at two-and-one-half years old, each had the mental skills of only a one-year-old.

Dunbrasky and Boston primarily measured the triplets' decline in growth against a standardized growth curve

chart. The state's medical witnesses explained that the growth curve was developed from a study of primarily middle class children in Denver, Colorado, and tracked the normal rate of growth by a curve for the height, weight, and head circumference of children. The study also indicated the percentages of children falling within particular measurements. All of the medical experts agreed that the curve was generally accepted in the pediatric medical community and that it could be applied to all children because, in determining where on the growth curve percentages a child would fall, the pediatrician would take into account genetic and environmental factors. The record indicated that Dunbrasky did not expect the triplets to fall within the fiftieth percentile but that the children were expected to be within the tenth to fifteenth percentiles given the parents' small stature and other factors.

The evidence showed that, when the triplets were born, they were below all the percentages in the growth chart.[6] By five-and-one-half months, one of the triplets had reached the fifth percentile in terms of weight, and the other two had also significantly caught up to the percentages on the growth chart. Dunbrasky explained that accelerated, catch-up growth is normal for prematurely born children, but that once they reach their point on the growth curve, their development should progress at the rate illustrated by the growth curve as normal development. However, she explained that the triplets were usually below even the fifth percentile on the chart during their first two-and-a-half years, and that, more importantly, the triplets' *rate* of growth did not follow the signature of the curve.

After over a year of intensive support from social agencies, Dunbrasky explained that the children have thrived only "intermittently" with that support in the home. The social service workers reported varying amounts of cooperation by mother and father. While the record indicates that the triplets were often ill, it also indicates that mother and

---

[6] Dunbrasky explained that the triplets were below the weight and size of children born after a full-term pregnancy; however, she stressed that the triplets did not have low weight for their gestational age.

father had difficulty providing adequate nutrition to the triplets. Testimony revealed that the parents did not follow instructions on nutrition and feeding or follow instructions to place the triplets on a regular feeding schedule and to offer them a variety of food. Indeed, the record indicated that mother and father continued to bottle feed the children well into October 1997 after they were instructed not to bottle feed the triplets because it was no longer an appropriate nor adequate source of nutrition. Social service workers were concerned about how the triplets could be surviving on the little food they observed the triplets eat.

Dr. Starr, a psychologist, conducted an examination of mother and father. He diagnosed mother with a personality disorder exhibiting passive aggressive, narcissistic, and antisocial features. Her intelligence testing indicated borderline intellectual functioning. In terms of mother's ability to benefit from therapy or training, Starr explained that mother was capable of understanding information given to her concerning homemaking or parenting skills but would have difficulty using that information. That difficulty in utilizing training or therapy was amplified by mother's inability or unwillingness to see alternative points of view. Starr stated that father was borderline intellectual functioning and diagnosed him with a personality disorder exhibiting passive aggressive and paranoid features. Starr explained that father would have difficulty understanding cognitive-based therapy or training and that he would be resistant to assistance because his profile suggested that he may not recognize his problems as a parent. Starr noted that father's nonparticipation in parenting the triplets was consistent with his diagnosis. Starr stated that those characteristics of mother and father were not likely to change and believed that neither were able to parent five young children.

The trial court dismissed the case at the close of the state's evidence, finding that the state had not presented sufficient evidence to establish a *prima facie* case for termination of mother and father's parental rights. Specifically, the trial court voiced skepticism that a growth curve developed from the Denver test group was probative of how these children should develop. Further, the trial court did not find the

evidence of the triplets' weight, height, and head circumference development as indicating anything other than that they were small in stature like their parents. The trial court explained that the state could not "tie" all the pieces of developmental evidence together to establish grounds for termination.

On appeal, the state argues that the growth curve chart was competent evidence to measure the triplets' normal *rate* of growth and that the curve indicated that the triplets were failing to maintain healthy development. More important, the state argues that the testimony of Dunbrasky and Boston established that the faltering development was due to inadequate nutrition and that developmental delay would be permanent if the triplets continued depressed growth. Mother and father concur with the trial court and further argue that the state failed to prove "failure to thrive" due to nonorganic causes. They argue that the triplets were often ill and that the state, therefore, did not rule out organic causes for their depressed development. Father further argues that, even if the evidence was sufficient to establish a *prima facie* case for termination of mother's rights, it was not sufficient to establish a *prima facie* case for termination of father's rights, arguing essentially that SCF has not met its statutory duty to provide reasonable efforts to father.

We examine whether the state established a *prima facie* case that mother and father were presently unfit to parent the triplets and that the present inability was unlikely to change, making integration of the triplets into mother or father's home improbable in the foreseeable future. *Pennington,* 104 Or App at 201. Once that is established, we examine whether the state has similarly established a *prima facie* case that the children's best interests will be served by terminating mother and father's rights. *Beasley,* 314 Or at 452.

■■ We have previously recognized the diagnosis of "failure to thrive" as evidence supporting parental termination. *See State ex rel Juv. Dept. v. Farrell,* 55 Or App 897, 899, 640 P2d 652, *rev'd* 290 Or 822, 642 P2d 1167, *modified* 58 Or App 258, 266, 648 P2d 401, *rev den* 293 Or 521 (1982), *cert den* 460 US 187 (1983) (initially finding evidence of daughters' failure

to thrive, in part, satisfied preponderance of evidence burden; on remand finding the same evidence, in part, satisfied clear and convincing evidence burden). The state provided sufficient evidence to establish a *prima facie* case for termination. The evidence established that the growth curve was applicable as a measure for the triplets' *rate* of growth and that the triplets did not follow a normal rate of growth and development. The medical experts attributed that condition to lack of nutrition and their opinions were corroborated circumstantially when the children gained weight in environments where they received adequate nutrition. It was further corroborated by testimony illustrating the parents' difficulty with feeding the triplets. While the triplets were often ill, none of the medical experts identified that as a cause of depressed development, especially where it affected brain growth. The experts also took into account the small stature of the parents and the triplets when making their diagnoses. Thus, with a sound benchmark for the rate of development, the genetic factors taken into account, the apparent severity of the failure to develop, and the circumstantial evidence in the record corroborating the diagnosis, the state presented sufficient evidence to show that the triplets had failed to thrive due to inadequate nutrition.

■　　　Further, the state presented sufficient evidence to show that that condition was due to the parents' inability to provide for the basic physical needs of the triplets despite the reasonable efforts of social services agencies to assist parents. Those services were equally available and intended to reach both parents. Father's choice not to participate does not change our conclusion that the social agencies made reasonable efforts to assist him. *See State ex rel SOSCF v. Frazier*, 152 Or App 568, 582-83, 955 P2d 272, *rev den* 327 Or 305 (1998) (while father failed to take advantage of or benefit from services, the record established that agencies, nevertheless, offered father sufficient services). Thus, the state's evidence also presented a *prima facie* case that both parents have failed to make a lasting adjustment sufficient to warrant return of the triplets after reasonable efforts by the agencies in question.

■　　　The state has likewise presented sufficient evidence to establish a *prima facie* case that both mother and father

were unlikely to be able to parent in the foreseeable future. Starr's psychological evaluation of parents combined with the evidence that parents were, in fact, unable or unwilling to follow through and alter their parenting skills established that point. *See id.* at 589 (evidence established that father made no progress toward adjustment of behavior, making it unlikely that conduct or conditions will change in foreseeable future).

■ Last, given the severity of the developmental delays and the likelihood that they will be permanent unless corrected, the state has established a *prima facie* case that termination of mother and father's parental rights will be in each of the triplets' best interests.

We reverse the trial court's judgment of dismissal and remand for continuation of the termination proceedings.

Reversed and remanded for further proceedings.