Argued and submitted January 28, affirmed August 21, 1991

In the Matter of
Helen Rene DeVore, a Child.
STATE ex rel JUVENILE DEPARTMENT
OF CROOK COUNTY
and Children's Services Division,
*Respondents,*

*v.*

JoAnn DeVORE,
*Appellant.*

(89-JV-0002-15; CA A66549)

816 P2d 647

Jeff M. Wilson, Prineville, argued the cause for appellant. With him on the brief was Dutli & Wilson, Prineville.

Cynthia A. Forbes, Assistant Attorney General, Salem, argued the cause for respondents. With her on the brief were

Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

EDMONDS, J.

Riggs, J., dissenting.

## EDMONDS, J.

Mother appeals the termination of her parental rights and permanent commitment of her daughter to Children's Services Division (CSD). ORS 419.523; ORS 419.527(1)(a). On *de novo* review, we affirm.

Daughter was eight years old at the time of trial. Mother testified that daughter was first sexually abused by daughter's father when she was about two years old, while mother and the father were living together. Mother separated from the father in 1984 and believes that he is dead. Mother first contacted CSD in 1985 when daughter was about three years old. Daughter had a vaginal infection, and mother was concerned about possible sexual abuse by mother's father (grandfather), who had sexually abused mother when she was between the ages of 10 and 12 and who was later convicted of sexually abusing mother and two of her sisters. The CSD caseworker told mother not to leave daughter alone with the grandfather. Because daughter was too young to identify her abuser, CSD was unable to pursue the matter.

Mother again contacted CSD in March, 1986, when daughter was four and one-half years old. Daughter had just returned from a stay with her grandparents, and mother was concerned that she might have been sexually abused. Daughter told the authorities that she had been abused by the grandfather. CSD advised mother not to leave daughter with the grandfather, because he was an untreated sex offender. No criminal prosecution of grandfather occurred.

At trial, evidence disclosed that daughter complained of being sexually abused between 1986 and 1988 by three other men who were associates of mother. Dr. Williams, a physician, testified that, when daughter told him in 1987 that she had been sexually abused by a man who lived with mother and daughter, he discussed that with mother and she agreed to make sure that daughter would not be left alone with him. In 1988, a known sexual offender was seen meeting daughter at the school bus and visiting in her home. There was evidence that mother was aware that he had sexually abused his nieces. Daughter observed mother engaged in sexual intercourse with him. In addition, mother hired a babysitter whose

boyfriend was a convicted sex offender. Mother also associated with some male alcoholics during that period.

Daughter also had other health problems. She first had seizures when she was about three years old. When they recurred in 1987, Dr. Williams suspected epilepsy and prescribed dilantin, an anti-seizure medication. He was concerned that the seizures were caused by stress, because mother had told him that daughter had the seizures when she was going to be left alone with grandfather. Williams referred daughter to CSD and she began therapy in February, 1988. In spring, 1988, daughter began acting out thoughts about suicide. Mother reported to daughter's teacher that daughter had talked about killing herself and had gone into the kitchen to get a knife. The teacher took daughter and mother to CSD for counseling. On May 13, 1988, CSD removed daughter from mother's home, and she was placed in a foster home. Shortly thereafter, daughter told a CSD therapist that she wanted to kill herself with a knife or step in front of a car. Dr. Sweet, a psychologist, testified that "you have to be really overwhelmed at that age to want to even consider that kind of [a suicide] idea." After daughter was placed in the foster home, she was weaned from medication and her seizures ceased.

In June, 1988, mother signed a service agreement with CSD. Mother agreed not to associate with known sexual offenders or alcoholics, to participate in parent training and to continue counseling. She attended parent training classes on a weekly basis for two years. The parent trainer testified that she had not seen substantial improvement by mother and that it was difficult to know how much information mother understood. She believed that daughter would be at risk if she were returned to mother's custody. Counseling was discontinued after a few months, because the counselor determined that mother was not benefitting from insight-oriented therapy.[1] She

---

[1] The counselor described insight-oriented therapy:

"That's where a person is able to understand what it is they are doing and what has happened to them. And then to make decisions for behavior based on what they have learned about that, and what they understand about what has happened to them. They have some idea of the choices that they have, and the responsibility that they have in making those choices. What the outcome might be of what they do so that a person begins to take responsibility for what they do."

said that mother "expressed all the right things" but "didn't really follow through." The counselor thought that mother needed a structured approach to behavior management, but she was not aware of any organization that could provide that type of treatment. A CSD caseworker tried individual counseling with mother. However, therapy was discontinued, because mother could not grasp the basic concepts. The caseworker testified that, although mother was making extremely minimal progress in her own personal life, she was not making any progress in being able to protect her daughter. He thought that mother might, after 8 to 10 years of therapy, be able to protect daughter.

In September, 1988, the court ordered mother to comply with certain requirements, including discontinuing her association with known sexual offenders or alcoholics. In October, 1989, CSD filed a petition to terminate mother's parental rights, because of her lack of progress in therapy and her continued association with known sex offenders and with alcoholics.

To terminate parental rights under ORS 419.523(3),[2] the state must prove, by clear and convincing evidence, that the parent is presently unfit and that the present unfitness is unlikely to change in the foreseeable future. *State ex rel Juv. Dept. v. Herman,* 69 Or App 705, 709, 687 P2d 812 (1984); ORS 419.525(3). The state argues that mother is unfit to be a parent for her daughter, because she has a mental illness that renders her unable to protect her daughter from sexual

---

[2] ORS 419.523(3) provides, in relevant part:

"The rights of the parent or parents may be terminated * * * if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"* * * * *

"(e) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

abuse. It asserts that, even with counseling and parent train-
ing classes, mother has not made any lasting changes in her
behavior pattern and that there is no reasonable likelihood
that she will improve to the point that daughter could be
returned to her custody in the foreseeable future. Mother
argues that she does not suffer from a mental illness and that
she has made positive changes in her conduct that would
allow her to be reunited with daughter in the foreseeable
future.

Sweet testified that mother suffers from a dependent
personality disorder,[3] that she does not have an adequate
understanding of daughter's developmental needs and that
her disorder is "very resistant to change." As an example, he
pointed out that mother allowed the grandfather to have
continued access to daughter, even though the grandfather
had raped mother when she was a child and had abused
daughter on more than one occasion. In his report, Sweet
said:

> "[Mother] is a very dependent, inadequate woman who lacks
> adequate cognitive skills to effectively and efficiently change
> her situation. She is likely to continue to engage in inap-
> propriate relationships, which obviously places herself and
> her daughter at risk. She admits to not understanding how
> she gets in these situations and I certainly agree with her lack
> of insight and understanding. She is the type of woman who
> can be easily led and manipulated by men."

Although mother participated in CSD's permanent
planning agreement, Sweet testified as to her lack of follow-
through:

> "In fact, CSD even said that [mother] was cooperating with
> what they were doing. But her limitation is that whoever
> she's hooked up with is essentially going to be making those
> kinds of decisions for her. And if you pull back that support
> system, and allow her to again do it on her own, that's when
> you are going to run into problems."

Sweet concluded that mother's mental disorder rendered her
incapable of providing for daughter's care for an extended

---

[3] Sweet testified that a dependent personality disorder is a diagnosable mental
illness, characterized by "indecision, high need for affection and attention, [and]
getting involved in inappropriate relationships where people end up making deci-
sions for you."

period of time and that reintegration of daughter into mother's home, under a minimally adequate standard of care, would be improbable in the foreseeable future.

Mother's expert witness, Dr. Dragovich, disagreed with Sweet's opinion that mother lacked the skills to change her situation. She said that mother showed no signs of a personality disorder. However, Dragovich conceded on cross-examination that, in arriving at her conclusions, she was not aware of all of mother's associations with known sex offenders. Moreover, she agreed that mother is likely to continue to engage in inappropriate relationships and that "insight-oriented treatment would be of limited value."

Sweet's conclusion is supported by mother's history. From 1983 to 1988, mother allowed daughter to be exposed to actual or possible sex abuse by five different individuals at separate times, despite repeated attempts by CSD workers and others to help her recognize the ramifications of her conduct. The record discloses numerous additional examples that mother is an unfit parent. Mother let daughter, then six years old, be responsible for her own medication. Williams discovered that, on one occasion, it was evident that daughter had not taken any medication, while on another occasion the medication was twice the therapeutic range. In addition to allowing daughter to have contact with sex abusers, mother also allowed her to spend the night with a neighbor who supposedly practiced satanism. Daughter had several seizures during and following contacts with that neighbor, and the CSD therapist testified that daughter was afraid of that person. Dr. Boehm, a pediatric physician, testified it was "very likely" that daughter's seizures were caused by her environment and said that it was reasonable to believe that daughter's seizures would resume if she is again subject to stressful situations. His opinion is supported by other testimony, including testimony that shows that daughter felt that it was her responsibility to take care of mother, that she did not like the men that mother associated with and that she was relieved not to be living with mother.

Despite the specter of the termination of parental rights hanging over her head and being told by CSD since 1988 that she needed to avoid inappropriate relationships, mother had not changed her lifestyle at the time of trial in

July, 1990. At the time of trial, mother visited two times per week in the home of a witness who employs one of the people who is suspected of sexually abusing daughter. She was also providing care to and living with an individual whose son is a convicted sex offender of a child. There was testimony that mother is occasionally assisted in her employment by a friend who is an alcoholic, and CSD caseworker testified that he had received reports that mother still associated with an alcoholic. One of mother's friends who testified at trial on her behalf admitted that he was under the influence of alcoholic beverages while testifying.

We conclude that the state has proven by clear and convincing evidence that mother is presently unfit to be a parent for daughter and that that is unlikely to change in the foreseeable future.

Affirmed.

**RIGGS, J.,** dissenting.

I disagree with the majority's conclusion that there is *clear and convincing* evidence that mother's present unfitness is unlikely to change in the foreseeable future. That conclusion is based largely on evidence of circumstances that existed more than one year before trial and ignores more recent evidence of mother's progress toward becoming an adequate parent. Although I do not suggest that daughter should be returned immediately to mother's custody, mother is entitled to a reasonable opportunity to show that her progress will continue and become permanent. *State ex rel Juv. Dept. v. Pennington,* 104 Or App 194, 201, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991); *State ex rel Juv. Dept. v. Wyatt,* 34 Or App 793, 798, 579 P2d 889, *rev den* 283 Or 503 (1978).

The majority places great weight on the testimony of the state's witness, Dr. Sweet, and disparages the conclusions of mother's witness, Dr. Dragovich. However, my review of the evidence does not show that Sweet is in any better position to predict mother's future behavior than is Dragovich. In fact, Sweet had substantially less opportunity than Dragovich to view and comment on mother's *current* circumstances. Sweet's testimony was based on a single meeting with mother, nearly two years before trial. Although he

testified at trial that mother suffers from a dependent personality disorder, a diagnosable mental illness, that diagnosis was not included in his initial report of July 27, 1988, in which he stated that the personality inventory test (MMPI) showed "no significant mood, thought or personality disorder" and that other tests showed mother had low self-esteem, was frustrated and indecisive, and was experiencing a great deal of depression.

Dragovich met with mother twice, on January 25, 1990, and February 1, 1990, approximately 18 months *after* Sweet's examination and just a few months before trial. Like Sweet, Dragovich reported that her tests showed "no signs of personality disorder, thought disorder or significant psychopathology." She disagreed with his opinion that mother was very dependent and lacked the skills to change her situation. She also disagreed with Sweet's testimony that mother has dependent personality disorder and testified that she saw "something nearly opposite to that configuration." Dragovich thought that mother could benefit from "modeling, direct instruction, and repetitious learning — she clearly has done just that from her continued Al-Anon participation." On cross-examination, Sweet acknowledged that it was possible for mother to improve through more practical, hands-on types of counseling.

The majority discounts Dragovich's conclusions, because she was not aware of every incident related to mother's past associations with sex offenders and alcoholics; however, she was generally well-informed about the situation and knew that mother's ability to avoid inappropriate relationships was the primary concern in this case. The majority's statement that Dragovich "agreed that mother is likely to continue to engage in inappropriate relationships" is incomplete. 108 Or App at 432. Dragovich only agreed with that conclusion "to some extent" and only "if things stay as they are."

The majority virtually ignores the deposition testimony of the CSD parent trainer, who testified that mother has attended weekly parenting classes regularly for the past two years, continuing to attend even after CSD officially withdrew its services in September, 1989. The parent trainer explained that mother lacked the specific skill of "how to

protect" herself and her child and did not know how to set boundaries with inappropriate people. Although she believed that mother was not yet able to protect daughter adequately, she had seen "some improvement" and testified that mother would eventually gain the skill. She also testified that, if she could work with mother and daughter together, the process would be much faster than working with mother alone.

The testimony of both psychologists and the parent trainer suggests that, with *appropriate* counseling and training, mother's ability to protect daughter will improve. Although the state argues that the type of services that might help mother are not available and that it can do nothing more to help her, the evidence shows that parent training has provided some of the hands-on help that mother requires and that the effectiveness of the training would be enhanced if the trainer worked with mother and daughter together. The evidence also shows that mother has been able to receive some help from her diligent participation in Al-Anon and an off-shoot of Al-Anon called Women Who Love Too Much.

The majority states that, at the time of trial, mother had not changed her lifestyle and implies that mother continues to associate with sex offenders and alcoholics. There is no evidence that mother associated with sex offenders after the spring of 1989, and no reliable evidence that she associated with alcoholics after February, 1990. The majority states that mother's employer's son is a convicted sex offender but does not mention that he lives out of state and is estranged from mother's employer. There is no evidence that mother associated with him. The majority also states that mother visits in the home of a witness who employs an individual suspected of sexually abusing her daughter, but there is no evidence that mother associates with that individual. Reports received by the CSD caseworker that mother still associates with an alcoholic are unconvincing. The sources are identified only as "concerned citizens" and do not indicate when the alleged associations had occurred. The individual who testified while under the influence of alcohol, identified by the majority as "one of mother's friends," 108 Or App at 433, had not associated with mother since September, 1989.

On *de novo* review, I would conclude that the state has failed to meet its burden of proof. The evidence is not

*clear and convincing* that mother cannot change or lacks motivation to change. Mother has cooperated with CSD and has made substantial efforts to change during the past two years. She did not cease her efforts when CSD withdrew its services, but continued with parent training and actively sought other sources of help, including Al-Anon and Women Who Love Too Much. The evidence is not *clear and convincing* that she will not be able to protect daughter adequately from harm in the foreseeable future. Rather, the evidence suggests that, with adequate resources and appropriate training, mother's progress may continue and become permanent. Mother maintains a close and loving relationship with daughter, and I would not end that relationship on the basis of the less than clear and convincing evidence presented.[1]

I would reverse the termination of parental rights and the permanent commitment of the daughter to the custody of CSD.

---

[1] The record shows that mother visits daughter on a regular basis and that they have a close and loving mother-daughter relationship. Daughter expresses concern and love for mother and enjoys her visits. The record of the supervised visits shows that mother's behavior was appropriate and caring.