Argued and submitted October 23, 1998, reversed and remanded
September 15, 1999

In the Matter of Christian Wilcox
and Savannah Wilcox, Minor Children.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES,
*Appellant,*

*v.*

Diana Michelle WILCOX,
aka Diane Michelle Locks,
*Respondent.*

(96-565CF; CA A101863)

986 P2d 1172

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Laura Graser argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Linder and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

The state appeals the trial court's denial of its petition to terminate the parental rights of mother to two minor children. The state contends that the court erred in its consideration of the children's needs in determining whether integration of the children into mother's home "is improbable in the foreseeable future." ORS 419B.504 (1995). We review the trial court's findings *de novo*, ORS 419A.200, assessing whether there exists clear and convincing evidence for termination. *State ex rel Juv. Dept. v. DeVore*, 108 Or App 426, 430, 816 P2d 647 (1991). We reverse and remand.

For four years the State Office for Services to Children and Families (SCF) has worked with mother to reunite this family. During those four years, SCF twice attempted to place the children with mother and both times had to remove them due to mother's alcohol abuse.[1] A third return to mother was imminent in the fall of 1997 before SCF resolved to proceed with the termination of parental rights. Mother has entered numerous service agreements with SCF, all of which have listed mother's abstinence from drugs and alcohol as a prerequisite to the return of her children. Other prerequisites called for mother to provide stable housing, secure stable employment, as well as participate in the children's early intervention programs. SCF also provided parenting classes as well as counseling for mother during part of this four-year process.

Through the four years, mother missed some visitation appointments with her children but by and large exhibited a high level of interest in them and, in various degrees, a willingness to work with SCF for the children's return. Mother, however, has had trouble maintaining sobriety and stable housing. She has been in and out of drug and alcohol treatment for four years and has completed two treatment programs, including a year-long residence and intensive outpatient program, and has relapsed after completing each. At

---

[1] More precisely, son was returned to mother twice and removed both times. Daughter was removed from mother's custody at birth, and SCF subsequently attempted to return daughter to mother one time but opted to take protective custody of daughter again.

the time of the termination hearing in January 1998, mother was entering yet another treatment program, and the children, ages four-and-a-half and three, were in the protective custody of SCF. We recite the facts in more detail.

SCF's first contact with the family was in late 1993. On Christmas Day 1993, mother returned home from her job to find her 19-month-old son badly beaten. Son was taken to the local hospital where injuries to his face, neck, and feet were treated. Hospital authorities contacted SCF because the injuries appeared to be due to intentionally inflicted trauma. Son had been in the care of mother's boyfriend, Gibson, who had been living with the family for about a month. Son had suffered two to three other injuries while in Gibson's care during that month. However, mother had believed Gibson's explanations for them.[2] There was evidence that Gibson's mother had warned mother on Christmas Eve that Gibson might have been mistreating son.

SCF took protective custody of son, intending to return him to mother after appropriate services were arranged. Mother severed her relationship with Gibson and cooperated with SCF. In the spring of 1994, she entered a service agreement with SCF and underwent a psychological evaluation. Because mother's history included substance abuse, SCF, in its first service agreement with mother, required mother to seek counseling and to stay "clean and sober."

At the termination hearing, mother admitted to heavy alcohol use after son was removed by SCF, even after she learned she was pregnant with daughter. Son was returned to mother in June 1994, when mother was six months pregnant with daughter. Mother testified that she did not use drugs or alcohol from the time son was returned until the day before daughter's birth in September 1994. Mother admitted taking methamphetamine the day before and drinking alcohol the day of daughter's birth. SCF again responded to the hospital's call based on mother's self-report. SCF took protective custody of son and daughter in the fall of 1994. Daughter exhibited traits of a drug-affected child.

---

[2] Gibson was subsequently convicted of abusing mother's son.

SCF's new service agreement required mother to enter substance abuse treatment. After treatment, relapse, and more treatment, children were returned to mother in June 1995. However, in July 1995, children were returned to protective custody after SCF discovered that mother had consumed alcohol and had reportedly lost housing. After an unsuccessful attempt to settle the children in California foster care, where mother could seek treatment in the company of a family support network, children were returned to Oregon in March 1996. In May, mother also returned to Oregon after withdrawing from her California treatment program due to financial difficulty as well as a desire to be close to her children. In June 1996, at SCF's request, mother underwent a second psychological evaluation and entered a year-long residential and intensive out-patient treatment program. In July 1997, mother suffered another relapse into alcohol use. In October 1997, mother was arrested for driving under the influence of intoxicants (DUII) with a blood alcohol content of 0.23 percent.

SCF repeatedly warned mother that the consequences of her alcohol abuse would be that SCF would proceed with termination proceedings. Indeed, mother was aware that SCF filed the petition for termination of her parental rights in mid-1996. Rather than proceed with the petition, SCF decided to continue to work with mother because she appeared to be making progress toward providing a safe and sober environment for her children. Twice SCF requested that trial dates be postponed because mother appeared to be making progress. However, following the DUII arrest in 1997, SCF decided to proceed with the termination petition.

At the termination hearings in January and February 1998, the court did not grant the petition to terminate mother's rights under ORS 419B.500 and ORS 419B.504 (1995). The trial court found that the state proved by clear and convincing evidence that mother was presently unfit to parent but did not prove by clear and convincing evidence that mother's rehabilitation and integration of children into her home was "improbable in the foreseeable future." ORS 419B.504 (1995).[3] The state challenges that latter finding,

---

[3] ORS 419B.504 provides:

arguing that the trial court failed to consider the *"entire* circumstances,"* which it asserts demonstrate that the children's reintegration into mother's home is improbable in the foreseeable future. *State ex rel SOSCF v. Frazier,* 152 Or App 568, 598, 955 P2d 272, *rev den* 327 Or 305 (1998) (emphasis in original).

■       The Oregon Supreme Court has explained that, under the pre-1997 versions of ORS 419B.500 and ORS 419B.504, determining whether termination is warranted is a two step process:

> " *'Even if* a court determines that a child's best interests will be served by a termination of parental rights, it may not be ordered unless the statutory grounds for termination have been established by clear and convincing evidence.'" *State ex rel Juv. Dept. v. Beasley,* 314 Or 444, 452, 840 P2d 78 (1992) (quoting *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 189 n 15, 796 P2d 1193 (1990) (emphasis in original)).

Thus, the court must first examine whether the state has proven by clear and convincing evidence that a parent is unfit to care for a child in the foreseeable future and only if that is established may the court then examine what measures are in the best interests of the children.

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1)  Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2)  Conduct toward any child of an abusive, cruel or sexual nature.

"(3)  Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4)  Physical neglect of the child.

"(5)  Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

■ ■　　ORS 419B.504 (1995) sets forth the statutory grounds for termination applicable here. It authorizes the termination of parental rights on a finding of unfitness. The state must establish by clear and convincing evidence the existence of conditions or conduct, including but not limited to addictive or habitual use of intoxicating liquors, that substantially impairs one's parental ability. *See State ex rel Juv. Dept. v. Randall,* 96 Or App 673, 675, 773 P2d 1348 (1989). The state must prove that mother is presently unfit to parent the children and then must prove that the present unfitness is unlikely to change, making integration of the children into mother's home improbable in the foreseeable future. *State ex rel Juv. Dept. v. Pennington,* 104 Or App 194, 201, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991); *State ex rel Juv. Dept. v. Herman,* 69 Or App 705, 709, 687 P2d 812 (1984).

■■　　We review the trial court's decisions *de novo*, weighing whether the state proved by clear and convincing evidence the elements warranting termination of parental rights. *DeVore,* 108 Or App at 428, 430. However, we give considerable weight to the trial court's findings, especially those based on witness credibility, because the trial judge, as trier of fact at a hearing, was in the best situation to assess the credibility of the witnesses. *State ex rel Juv. Dept. v. Boren,* 105 Or App 599, 601, 806 P2d 149 (1991).

■■　　The court found that the state established the first element and that "[m]other has an addictive or habitual use of intoxicating liquor to the extent that her parental ability has been substantially impaired."[4] We similarly conclude that the state presented clear and convincing evidence that mother's ability to parent was substantially impaired due to her alcohol abuse. Simply alleging alcohol abuse is insufficient to establish a parent's inability to parent. *See Randall,*

---

[4] The court also found that:

"2. Mother has failed to present a viable plan for the return of the children to the mother's care and custody.

"3. Mother used alcohol and drugs during her pregnancy with [daughter], which use affected the child."

We conclude, without discussion, that those findings are clearly and convincingly supported by the evidence. While those findings are distinct, the trial court's finding of mother's alcohol abuse is the conduct that primarily supports these findings. Thus, we do not address them separately.

96 Or App at 675 (considering a petition to make daughter a ward of the court under ORS 419.476); *State ex rel Juv. Dept. v. Harden,* 51 Or App 681, 686, 626 P2d 944 (1981) (alcohol abuse alone is not sufficient to terminate parental rights). The state must also produce factual evidence indicating how that alcohol use has "substantially impaired" parental ability. ORS 419B.504(3) (1995); *see Randall,* 96 Or App at 676; *Harden,* 51 Or App at 686 (state must show that the alcohol problem is seriously detrimental to the child). The state has done that here. Mother's alcohol and drug use directly and physically affected daughter. Both children are reportedly "hard to handle." Daughter was born displaying signs of being drug affected and today suffers developmental delays that are consistent with prenatal drug and alcohol exposure. The state also presented numerous opinions from family counselors, psychologists, and state workers that mother is unable to provide the care both children require when she is using alcohol, namely that she is unable to provide stability, permanency, and nurturing for her children. Those opinions are supported by mother's history of drinking just before the children would have been returned to her, thereby precluding their return to her care and resumption of a stable family unit. Last, mother's extremely high blood alcohol content and DUII arrest, just months before trial, indicates the poor and perilous choices mother makes while using alcohol.

The court next found that the state did not establish by clear and convincing evidence that "[m]other is incapable of adequately parenting the children within the foreseeable future." On appeal, the state argues that the court erred by refusing to consider the *"entire* circumstances" in measuring mother's ability to parent in the foreseeable future. *Frazier,* 152 Or App at 598 (emphasis in original). The trial court explained that "[t]he issue of foreseeability in the context of [ORS] 419B.504 [1995] focuses attention on the parent's ability to parent within the foreseeable future." Despite the evidence that the children need "permanency now," the trial court explained that "the evidence presented does not prove by clear and convincing evidence that mother cannot adequately parent these children in the foreseeable future."

The state argues, in essence, that the trial court did not properly consider the children's needs in assessing

whether they would be able to be reintegrated in mother's home in the foreseeable future. In particular, the state's case focused on the prolonged efforts that SCF undertook to reunite this family as well as the mental health professionals' opinions as to whether mother could reform within a time meaningful to the children. While the record reflects that the trial court *considered* the children's needs, it did not measure the time frame of "foreseeable future" by the immediacy of the children's needs. The state argues that the 1995 version of the statute requires consideration of the temporal effect on the children's needs.

■ The question then is whether "foreseeable future" allows the trial court to terminate parental rights based on the *immediacy* of the children's needs. We think the trial court correctly parsed the meaning of the statute, examining its text and context. *PGE v. Bureau of Labor and Industries,* 317 Or 606, 859 P2d 1143 (1993). Because the statute does not define those terms, we begin by according the phrase its plain, natural and ordinary meaning. *Webster's Third New Int'l Dictionary,* 890 (unabridged ed 1993), defines "foreseeable" as "being such as may reasonably be anticipated" and "lying within the range for which forecasts are possible * * *." "Future" is defined as "time that is to come" and "what is going to happen." *Id.* at 926. From that, we can discern no connotation that the time frame "foreseeable future" is measured by anything other than the court's *ability* to forecast what is to come.

■ Nor does the context of the sentence connote foreseeability from the child's perspective, thus requiring a parent to rehabilitate within a time frame meaningful to the child.[5] ORS 419B.504 (1995) requires us to consider whether "integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change." That inquiry focuses primarily on the parent. Indeed, present unfitness to parent is measured by the parent's "conduct or condition seriously detrimental to the child." Of course, examination of the child's needs is a

---

[5] Of course, the statute contemplates that the child still requires parenting in the foreseeable future, but that is distinct from whether the foreseeable future is defined by the child's time-dependent needs.

necessary part of that inquiry as well. For example, minimally adequate parenting skills may be different for a severely disabled child from those for a child that has no disabilities. Thus, consideration of the types of needs a child may have is relevant to assessing the adequacy of the parent's skills in the present and in the future.

Whether integration of the child into a parent's home is improbable depends on the likelihood that the parent will be able to meet the child's needs with minimal adequacy. Again, we focus on the parent's skills, conduct, or condition with respect to the child's needs. The logic of the statute then instructs us to consider whether the *parent's* conduct is "likely to change" in the foreseeable future to an extent that would permit the child's reintegration into the parent's home. The statute contemplates consideration of the different needs a child may have when measuring whether the parent will likely be able to adequately meet those needs. That is distinct from a statutory requirement that the court measure foreseeability by those needs. Nothing in the statute instructs the court to view what is foreseeable from the child's perspective. *Compare* ORS 419B.504 (1997) (requiring the court to assess the probability of reintegration of the child into the parent's home "within a reasonable time," where "reasonable time" is defined as "a period of time that is reasonable given a child's emotional and developmental needs and ability to form and maintain lasting attachments," ORS 419A.004(17) (1997)).

We have taken into consideration the "*entire* circumstances" of a case, *Frazier,* 152 Or App at 598 (emphasis in original), and our application of ORS 419B.504 (1995) is consistent with that interpretation of the statute. For example, in *Frazier,* we considered the extent of the state's efforts, the needs of the children, the parents' efforts to change to meet those needs, and their progress in those efforts. After seeing no progress, we affirmed the trial court's order of termination. *Id.* at 602-03. We similarly affirmed the trial court in *State ex rel Juv. Dept. v. Charles,* 123 Or App 229, 859 P2d 1162 (1993), *rev den* 318 Or 326 (1994), where the state worked with mother for about three years to be able to parent her special needs children. In that time, mother's "participation [in drug treatment] was, at best, inconsistent and passive." *Id.* at 231. Her parenting and life choice skills had not

improved and she had been unable to retain a stable job or residence. *Id.* In *State ex rel Juv. Dept. v. Oseguera,* 96 Or App 520, 773 P2d 775 (1988), we affirmed an order of termination where mother was resistant to addressing her alcohol problem, hostile to change, unable to remain sober, and unable to retain steady employment. We affirmed, as well, a termination order where the mother neither had the "present ability nor the inclination" to provide the stable and secure home environment needed by her emotionally disturbed children. *State ex rel SCF v. Ettinger,* 143 Or App 418, 424-25, 923 P2d 1290, *rev den* 324 Or 395 (1996). Thus, we have regularly taken into account the children's needs in determining whether it is possible to forecast whether integration of the children into the parent's home is "improbable." ORS 419B.504 (1995).

In *State ex rel CSD v. Rollins,* 140 Or App 222, 226, 914 P2d 1094 (1996), after reviewing the "duration, intensity and quality of mother's *entire* history with drug treatment programs, support agencies and other forms of assistance," we concluded that the state did not prove "by clear and convincing evidence that mother's current efforts to change her circumstances were destined to meet with failure." There, the state showed that the mother had a long history of drug abuse for which she was, at the time of the hearing, incarcerated. However, by that time, the mother had been drug free for about a year, she exhibited a high interest in becoming an adequate parent, and voluntarily, and with success, participated in a drug and alcohol treatment program while incarcerated. Thus, we have denied termination petitions where the parent's latest efforts to change appear sincere and those efforts are not reasonably destined to fail but may be successful within a reasonable time. In all of our cases, our focus has been on the parents' ability to change rather than on the child's time-dependent needs.

We therefore consider whether the state proved by clear and convincing evidence that under the "*entire* circumstances," mother's "pattern [of alcohol abuse] demonstrates that it is highly unlikely that mother will, within a reasonable amount of time, be able * * * to *consistently* care for the children in a safe environment." *Frazier,* 152 Or App at 597-98 (emphasis in original). The state presented compelling, and largely uncontradicted, evidence that only if mother

totally abstains from alcohol can she provide for the needs of her children. Dr. Sweet, a psychiatrist, completed a psychological evaluation of mother in June 1996, as well as an evaluation of son and daughter in April of the same year. Sweet explained that the children, although bonded to each other, had lacked a sense of permanency in their lives due to the ambiguity of their situation in various foster homes and in mother's home. He explained that permanency is a "very, very important factor in development," especially as it relates to the children's abilities to establish relationships and solve problems. He stated that for mother to be able to parent adequately, she would need to demonstrate that she is not using alcohol or drugs because they impair her judgment and her ability to provide the necessary stability for her children. It would also be important that she learn stress-coping skills rather than turning to alcohol.

A more recent assessment concurred. Mr. Gomez, a child and family therapist, worked with mother from December 1996 to September 1997. He also worked with the children starting in the summer of 1997 until the time of trial. Gomez opined that the children "have suffered extensive damage, trauma" from the lack of consistency and sense of permanency in any one home. He related that the children needed

> "stability, predictability, constancy, a parent who is able to manage their behavior, which is at times difficult * * *. They are defiant, they are not compliant at times. And so it would require a parent who is able to manage their behavior, able to balance structure and nurture on a daily basis consecutive 24 hour periods. See to their safety, keep them away from the negative effects of alcohol or drug abuse, including domestic violence, domestic abuse, sexual abuse."

He opined that mother presented a threat to her children when she resumed drinking.

Finally, in January 1998, Dr. Wayland, a child psychiatrist, conducted a court-requested evaluation of son to discuss his ability to bond with other parent figures.[6] Wayland agreed that son's behavior is difficult to manage at times

---

[6] A similar assessment was not conducted on daughter. Daughter had spent very little time with mother, and mother, who at one time sought to have daughter adopted, conceded that her bond was not as strong with daughter as with son.

and diagnosed son with adjustment disorder and disturbance conduct. She agreed that what son needed more than anything else was stability and permanency.

The state's key evidence of mother's inability to parent in the foreseeable future was Sweet's testimony. He diagnosed mother with alcohol dependency, depression, and personality disorder with borderline, passive aggressive, and dependent features. Sweet acknowledged that the alcohol dependency and depression were treatable conditions. He explained, however, that mother's passive aggressive personality disorder interferes with her ability to profit from services, because her personality disorder manifests itself in "avoidance of responsibility and not following through." After comparing his evaluation with one conducted in 1994 by another psychiatrist,[7] he concluded that mother had not undergone any positive change and gave her a "poor to guarded" prognosis. In Sweet's opinion, it has been the external pressure from SCF that has caused mother to pursue the treatment she has, and she "will continue to go through these cycles of having severe problems, especially relying on alcohol."

In addition to the fact that mother entered two long-term treatment programs and relapsed after completing each, the state also presented evidence from Dr. Chamberlin, an alcohol and drug abuse therapist with whom mother worked for about one month while living in California. The evidence from Chamberlin is somewhat conflicting. In a letter to SCF, he explained that mother was "still emotionally blunted * * * [to] how her addictive behavior has impacted her ability to parent her children," but stressed that she was invested in her treatment. At the hearing, his testimony revealed that mother's participation was "luke warm," that she had made poor progress, and that, given her history of relapse, she had a poor prognosis for recovery.

Gomez worked with mother on developing sober and responsible decision-making skills after she entered the long-term inpatient alcohol treatment in 1996 and before mother

---

[7] We do not recite the findings of that 1994 report, as the state did not offer it for the truth of the matters asserted therein.

relapsed in October 1997. Gomez's perception of mother's progress was generally favorable. However, he tracked some of the problems identified by Sweet: (1) Mother was able to make a serious effort for a while but had trouble sustaining that effort; (2) mother minimized the problems associated with her occasionally choosing to be around alcohol; and (3) mother had made less progress in taking responsibility for the damage to her children caused by her choices. Gomez did highlight mother's positive choices—that she had acquired her own apartment and a job that did not primarily involve serving alcohol. Gomez also explained that mother was resistant to accepting the reasons why son needed counseling for the abuse inflicted on him. He noted, however, that mother began to address the underlying issues regarding her children's needs and her responsibility. He opined that mother would need at least a year of sobriety before she was able to parent adequately. Mother's actions in the fall of 1997 gave Gomez "serious pause" about mother's ability to meet her children's needs within a time meaningful to the children.

Ms. Cherney, mother's counselor at the 1996-97 inpatient treatment program, testified on behalf of mother. Cherney, who had last spoken with mother one day before trial, explained that mother was "very, very open" in group therapy sessions, except where it concerned her childhood. Cherney related that mother was very involved in her treatment and in the recovery community. Mother went to outside support group meetings and had a sponsor. Mother expressed guilt about how her decisions had affected her children and saw treatment as a way to change those things. Cherney explained that relapses are very common in recovery and that relapses can be therapeutic if the person learns something from the relapse. She explained that the fact that mother consulted with Cherney after her 1997 relapses was a good sign that mother's relapses were therapeutic. It was Cherney's opinion that the relapses were caused by stress surrounding the custody of her children. She gave mother a good prognosis for recovery even after the 1997 relapses.

In addition to Cherney, mother had several witnesses testify on her behalf. Mother's sister, the children's long-time foster parent, and the children's teachers all

explained that mother was appropriate and loving with the children. They testified that mother followed through on instructions to improve her parenting skills, and that the children were very affectionate toward mother. An April 1997 SCF review noted that mother was receptive to home visits, her home was "spacious, tastefully decorated, neat and tidy," and she provided the children with a great deal of affection during their visits. SCF workers also agreed that the children were never physically harmed nor neglected during their brief sojourns with mother when she was using alcohol. Mother's employer of six months also testified to mother's work ethic and dependability.

However, mother's own testimony corroborated crucial aspects of the state's evidence. Mother signified that she understood she had to abstain from alcohol and drugs for the rest of her life. However, she also indicated that alcohol use did not necessarily make a person a bad parent, which, in context, signified some continued denial of how her alcohol use affects her ability to parent. Mother also acknowledged certain aspects of her "cycle" of recovery and relapse, namely that her relapses are primarily caused by stress and that she has used alcohol to cope with that stress. Mother also made excuses for the fact that she had just recently made arrangements to enter treatment again, some four months after her latest relapse and DUII arrest. That treatment program was also mandated by her DUII diversion, and there is no direct evidence that mother was involved in volunteer outside support groups. However, mother did express a desire to gain the return of her children. She also expressed a desire, both in connection with and independent of the outcome of this proceeding, to achieve sobriety.

We find that the state has proven by clear and convincing evidence that it is "highly unlikely that mother will, within a reasonable amount of time, be able * * * to *consistently* care for the children in a safe environment." *Frazier,* 152 Or App at 597 (emphasis in original). While mother did present evidence of a good prognosis for alcohol recovery, that evidence is discounted by evidence that mother has not yet grasped fundamental tools which would render her history unlikely to be repeated through the foreseeable future. The

state demonstrated a pattern of recovery and relapse, often triggered by the stress surrounding the custody of her children. The state also demonstrated that that pattern is primarily due to (1) the external pressure from SCF to seek help; (2) mother's inability to internalize the changes required to make a lasting adjustment; and (3) mother's inability to accept responsibility for and follow through on the consequences which have flowed from her alcohol abuse.

Gomez, who worked with mother only months before trial, still noted mother's problems with responsibility and follow through, particularly noting mother's emotional and intellectual bluntness to her son's needs for therapy. That behavior was mirrored in the events that led up to the termination hearing. According to mother, and also in Cherney's opinion, mother's 1997 relapses were due to stress, indicating that mother had not yet found a different coping mechanism. That is a dangerous situation where, we note, parenthood is replete with difficult decisions and stress, especially with "hard to handle" children, as son and daughter are. What is notable about those relapses, however, are their apparent severity. Mother's blood alcohol level, while driving a car, was 0.23 percent, a very high percentage. Additionally, it appears that mother was seeking additional treatment at the time of the hearing only because of the external pressure from the DUII arrest. And even given that external pressure, mother provided only excuses for why it had taken her four months to seek that treatment. Her testimony also did not further her case but indicated that she still harbored some denial of how alcohol abuse can affect one's ability to parent.

This case is not analogous to *Rollins*. In that case, the mother had been sober for a year at the time of the termination proceedings and had voluntarily entered treatment, in which she excelled. In contrast, here, while mother claimed to have been sober for several months before trial, SCF demonstrated that mother has repeatedly been unable to maintain her sobriety. She has had four years of substantial help from SCF before the termination hearing to demonstrate some progress in a lasting recovery. However, we cannot discern how mother has benefitted, in a fundamental manner, from those efforts. Mother's behavior indicates that primarily external pressure modifies her behavior and that

she has not internalized her dependancy and denial issues to enable her to work on her alcohol abuse problems independently and in a lasting manner. For those reasons, we cannot predict when mother might conquer her illness. Given SCF's previous and sustained efforts combined with mother's resulting behavior preceding the termination hearing, we do not believe that she will be able to complete that difficult task in the foreseeable future. Rather, we see that the ingredients that fuel mother's cycle of recovery and relapse are still readily available and unlikely to change.

We next find that the state proved by clear and convincing evidence that the best interests of the children will be served by terminating mother's parental rights. ORS 419B.500. Both Gomez and Sweet agreed that the children need permanency and security very soon and that further delays put the children at risk developmentally, especially in the area of establishing relationships. Both agreed that mother could not provide that security within a time meaningful to the children. In particular, Sweet stated that

"extending this longer and longer in the hopes that maybe Mom will change * * * might be okay for Mom, because as adults our perspective on time and where we are developmentally is extremely different than where it is for a young child * * *. I recommended seeking other alternatives rather than waiting the year and a half, possibly even two years to see if Mom could get on track this time."

Gomez predicted mother would need at least a year of sobriety before she would be able to parent and that the children could not wait even six months. Important, also, was Wayland's testimony regarding son. She stressed that son had spent two-thirds of his life in an "unstable situation" and that one has "to keep in mind [a child's] concept of time developmentally as well as how they perceive it." She concluded:

"[Son] appears to be a remarkably resilient youngster, although there are limits to this flexibility, and I am concerned that he may be near the end of his ability to simply accept whatever comes his way. * * * What he needs more than anything else now is stability, and he needs it quickly. His behavior is somewhat hard to manage, and he will require good, not merely adequate parenting. If the court determines from other investigation and testimony that

mother is not able to provide that stability and level of parenting NOW, I believe it would be in * * * [son's] best interest to be released for adoption." (Emphasis in original.)

The state also established that the children were not irretrievably bonded with mother. Mother never claimed an especially close bond with daughter but did with son. However, Gomez stated that while the children are bonded to each other, their expectation of reuniting with mother is not very strong or deep. He explained that the children did have a bond with mother, but it was more as an aunt or family friend rather than as a caregiver or limit setter. Wayland's assessment concurred. In her opinion, son did have a bond with mother, but it was not particularly strong, and he could bond with other parent figures if given enough time.

Last, the state established that the children are adoptable. Ms. Kallstrom, a supervisor for adoptions with the state, testified that the children would not be separated for adoption. Kallstrom indicated that, with children who have especially high needs and are older, finding adoptive placement can take a long time. However, because son and daughter are relatively young, are attractive and of average intelligence, and do not have really significant behavior problems or other special needs, placement could likely be found within six months.

Given the immediacy of the children's needs, the absence of a strong bond with mother, and the favorable prospect of adoption, it is in the best interests of the children to terminate mother's rights.

Reversed and remanded for entry of judgment terminating parental rights to two minor children.