Argued and submitted July 11, 2000, affirmed February 28, 2001

## In the Matter of
## Jesi Rae Lehtonen, a Minor Child.

## STATE ex rel STATE OFFICE FOR
## SERVICES TO CHILDREN AND FAMILIES,
*Respondent,*

*v.*

## Robin Elaine LEHTONEN,
*Appellant,*

*and*

## Gary LEHTONEN,
*Respondent.*

## (95004003; CA A108746)

20 P3d 210

Timothy P. Dunn argued the cause and filed the brief for appellant.

Lainie F. Block, Assistant Attorney General, argued the cause for respondent State Office for Services to Children and Families.

No appearance for respondent Gary Lehtonen.

Before Deits, Chief Judge, and Haselton,* and Wollheim, Judges.

DEITS, C. J.

---

* Haselton, J., *vice* De Muniz, P. J., resigned.

### DEITS, C. J.

Mother appeals from a judgment terminating her parental rights to her daughter (child), who was five years old at the time of trial. ORS 419B.500. On *de novo* review, ORS 419A.200(5); ORS 19.415(3), we hold that the State Office for Services to Children and Families (SCF) proved by clear and convincing evidence that mother's conduct or condition has been seriously detrimental to child, that child's integration into mother's home is improbable within a reasonable time, and that it is in child's best interests for mother's parental rights to be terminated. ORS 419B.504. Accordingly, we affirm.

Mother is a 49-year-old divorced Army veteran.[1] She suffers from alcoholism and bipolar disorder. Mother and child first came to the attention of SCF in October 1994 when child was about four months old. A protective services worker received information that mother was consuming large quantities of alcohol and breast-feeding child. Mother admitted to her doctor that she was drinking. However, a home visit by the protective services worker failed to find any evidence of mother's excessive drinking and no further action was taken. In April 1995, mother was involved in a motor vehicle accident and was arrested for driving under the influence of intoxicants (DUII). Her blood-alcohol level at the time of arrest was .268, more than three times the legal limit. Child was in the car at the time of the accident and was placed in the temporary custody of SCF. Following her arrest for DUII, mother completed a 28-day inpatient treatment program at the Veterans Affairs Medical Center (VAMC) in Roseburg. Thereafter, mother began outpatient treatment at the Yamhill County Chemical Dependency program. Child was returned to mother's custody in August 1995, and, in December of the same year, the temporary custody proceeding was dismissed.

In January 1996, mother was arrested for violating her DUII probation because she was visibly intoxicated when

---

[1] Father's parental rights were terminated in the same proceeding. He has not appealed from that judgment.

a police officer contacted her at home. Child was placed in foster care but was returned to mother's custody in February 1996 after mother again satisfactorily completed a chemical dependency program. Community complaints about mother's drinking surfaced in July 1996. At that time, mother's SCF caseworker and her probation officer discussed returning child to foster care but, instead, on July 15, 1996, mother entered into a service agreement with SCF in which she agreed to maintain sobriety, continue her treatment and not allow father to visit with child unsupervised.[2]

On August 1, 1996, mother was arrested a second time for DUII. Father and child were both in the car. Child was placed in foster care for the third time. Mother then enrolled in the dual recovery program (for substance abuse and mental health issues) at the VAMC in Portland. VAMC discharged mother to a residential treatment program in Eugene. She successfully completed the program in Eugene and, after that, re-enrolled in treatment for her mental health and substance abuse problems at VAMC in Portland.

Mother was evaluated by psychologist Dr. Sweet in December 1996. Sweet diagnosed alcohol dependence in early full remission, major depression and personality disorder NOS (not otherwise specified) with characteristics of dependent and passive-aggressive personality disorders. Sweet opined that mother's problems were chronic and unlikely to change in the future. He said that a year and a half of ongoing treatment was necessary before SCF would be able to determine if mother could stabilize in the community. In April 1997, Dr. Elmore of VAMC diagnosed mother as bipolar with a borderline personality disorder and alcohol dependence in early full remission. By July 1997, substance abuse treatment providers at VAMC believed that mother's prognosis for continued recovery was good because she was continuing with her treatment program. The dual recovery program treatment team concurred and recommended that mother be allowed to resume custody of child. In August 1997, mother regained custody of child.

---

[2] Mother and father were separated by this time.

Between August 1997 and August 1998, mother resided in Vancouver, Washington, and was supervised through the State of Washington. Mother was observed with child on various home visits by Shaver, a Washington State caseworker. Shaver testified that on some occasions child appeared well cared for but, at other times, "the house was in chaos. The child was not particularly [well] kept and Mom was having a hard time tracking." A home study was completed in April 1998. The study found that the placement barely met sufficiency requirements but recommended that child remain with mother under certain conditions, including continuing the VA treatment program and obtaining recommendations from mother's psychologist and treatment provider that she was able to care for child. In August 1998, the Washington State caseworker recommended that SCF dismiss its case because mother seemed to be doing very well.

However, before the dismissal could be initiated, mother began drinking again and required inpatient detoxification. Child was again removed from mother's custody. After completing detoxification, mother was hospitalized for psychiatric care. In the fall of 1998, mother entered intensive outpatient treatment through VAMC and also returned to the dual recovery program. Sweet reevaluated mother in January 1999. His diagnosis remained consistent: alcohol dependence and personality disorder NOS; he also concurred with VAMC's bipolar diagnosis. Sweet said that mother had a high potential for relapse and would require intensive support for an extended period. He recommended at that time that a permanent alternative be found for child, because mother was likely to continue to have relapses and periods of instability.

In February 1999, SCF notified mother that the agency had changed its recommendation from dismissal to adoption. SCF filed a petition to terminate mother's parental rights in May 1999. Between May 1999 and the time of trial, mother attended supervised visits with child. In June 1999, she completed the Volunteers of America parenting program to which SCF had referred her. At the time of trial, November 1999, mother was reportedly in the final phase of an intensive program at VAMC with six to eight weeks remaining. Mother's treatment providers believed that she had made

significant progress, that she seemed more involved in treatment, and that she was more willing to take responsibility for herself and her problems.

The trial court found mother unfit because she: (1) engages in the addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired; (2) suffers from an emotional illness, mental illness or mental deficiency of such nature and duration as to render her incapable of providing proper care for the child for extended periods of time; and (3) has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such an extended duration of time that it appears reasonable that no lasting adjustment can be effected. The court also found that termination of mother's parental rights was in child's best interests.

■■ The termination of parental rights is governed by ORS 419B.498 to ORS 419B.508. In this case, the focus is on ORS 419B.504, which addresses parental fitness.[3] Before a petition to terminate parental rights can proceed, the child must be within the jurisdiction of the court. ORS 419B.100. In seeking the termination of a parent's rights under ORS

---

[3] ORS 419B.504 provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2) Conduct toward any child of an abusive, cruel or sexual nature.

"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4) Physical neglect of the child.

"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child."

419B.504, the state has the burden of showing by clear and convincing evidence, ORS 419B.521(1), that the parent is presently unfit to care for the child. *State ex rel Juv. Dept. v. Pennington*, 104 Or App 194, 201, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991). Under ORS 419B.504, the state must show both that the parent is "unfit by reason of conduct or condition seriously detrimental to the child" and that the "integration of the child into the home of parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change." The court must also find that termination of parental rights is in the best interests of the child. ORS 419B.500. If the state fails to satisfy either element of ORS 419B.504, termination of parental rights is not appropriate, even if the court finds that it would be in the child's best interests. *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189 n 15, 796 P2d 1193 (1990).

■■ As a general rule, alcohol or other chemical dependence alone will not justify termination of a parent's rights to a child. *State ex rel Juv. Dept. v. Randall*, 96 Or App 673, 675, 773 P2d 1348 (1989). However, addictive or habitual use of alcohol or controlled substances may so impair a person's ability to care for a child that termination is justified. *State ex rel SOSCF v. Wilcox*, 162 Or App 567, 574, 986 P2d 1172 (1999). Here, mother argues that the state failed to prove by clear and convincing evidence that her condition has impaired her ability to care for her child to the point that child has suffered serious detriment. We disagree. Child was five years old at the time of trial. During her short life, she has spent about one half of her time in foster homes separated from her mother. Specifically, since April 1995, when child was first taken into protective custody, she has spent 32 of 54 months in foster care. The evidence shows that this instability in child's life has been seriously detrimental to her.

Dr. Thorbecke, a psychologist who specializes in attachment disorders and who was treating child, testified that child's circumstances have had a serious impact on her. Thorbecke said that he was treating child because she was having behavior difficulties, such as tantrums and bed wetting. Apparently, she was having particular difficulties around the time of her visitations with mother. As Thorbecke

explained, child "has a great difficulty dealing with all the circumstances that are going on in her life." He further stated: "I think she [child] is being adversely affected by this whole situation where she has, from my understanding, has been removed from her home several times and she is really struggling with it."

Thorbecke testified that child suffered from a reactive attachment disorder and that the severity of child's disorder was moderate. Thorbecke stated that the disorder was caused by child's having to "go[ ] back and forth" from a foster home to mother's home. He indicated that, if the process of "going back and forth" continues, the risk to child will be that she will act out: "She will get sad. She will get aggressive, continue to be aggressive. She will be anxious. And she will have great difficulty establishing a bond with some primary caretaker in the future." Thorbecke testified that child needs "a lot of structure in her life, a lot of predictability," and a primary caretaker that is "going to be there for some length of time."

One of child's SCF caseworkers, Pullen, also describes child as suffering from the lack of stability in her life. She stated:

"My opinion is that [child] needs stability. And she * * * needed it since she was an infant, and she has not had it. And that has had a negative effect on her. And that she needs to be placed in a structured stable environment to try to correct those, the problems that [child] now has because of it."

The evidence also demonstrates that, during the time periods when child has been in mother's care, she has at times been placed in high-risk circumstances. On at least three occasions, child was found with mother at a time when, due to excessive alcohol consumption, mother was unable to care for child. As mentioned above, in April 1995, mother crashed her car into a ditch with child in the car. At that time, mother was found to have a blood-alcohol level of .268, and child was taken into foster care. Child was returned to mother eventually. However, in January 1996, the police were called to mother's home where she was found to be

under the influence of alcohol and was arrested for a probation violation. Child was again taken into foster care. In August 1996, two weeks after she had signed a service agreement with SCF in order to avoid again having child taken from her, mother was stopped and arrested for another DUII. Child was again in the car. Child was taken into protective custody because, in the arresting officer's view, mother and the two male occupants of the car were extremely intoxicated and unable to care for child. The experts here clearly testified that the instability that has occurred in child's life has had a negative impact on child and that continued instability poses a serious risk of further harm to child. We conclude that the evidence establishes that mother's conduct and condition have been seriously detrimental to child.

Mother also argues that the state failed to prove that it is unlikely that she will be able to effect a lasting change within a reasonable time. This is the most difficult and troubling issue presented by this case, because mother has at times made progress and has shown herself capable of parenting. The question that must be answered is whether, within a reasonable time, mother will be able to overcome her deficiencies so as to allow her to function consistently as a minimally adequate parent. *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den* 327 Or 305 (1998). Under the applicable statute, the decision as to what is a "reasonable time" is determined in part by "a child's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(21).

■ After considering mother's history and pattern of successful treatment and relapse, the length of time that mother has been given to stabilize her life, as well as child's age and needs, we agree with the trial court that the state has proved by clear and convincing evidence that it is improbable that mother's conduct or condition will change within a reasonable time. As discussed above, mother has a lengthy history of alcohol abuse and has engaged in a consistent pattern of substance abuse, treatment and relapse. As the experts testified, mother's mental health problems make her ability to deal with her addiction all the more difficult. During child's life, mother has relapsed at least four times, and

each time it has been necessary to remove child from her care. Mother has successfully completed the treatment programs but, each time, she has been unable to follow through after treatment has been completed. Before mother's October 1998 relapse, SCF's plan was to reunify mother and child. After that relapse, SCF became increasingly concerned about mother's ability to make a lasting adjustment and about the impact of this instability on child. Because of that concern, SCF arranged for mother to be reevaluated by Dr. Sweet. Sweet did so in January 1999. His diagnosis at that time was similar to his diagnosis in 1996; he stated that mother had a high potential for relapse because of her history of substance abuse and her bipolar disorder. He testified that her pattern of relapse and treatment was concerning. As he stated: "It's been a pattern and the best predictor of future behavior is actually past behavior." Based on Sweet's evaluation and mother's history, SCF decided to change the goal for child to adoption.

■ During the time periods when mother has suffered relapses, she has not been a minimally adequate parent. A person such as mother, however, must be given a reasonable opportunity to show that she has changed and that the change is permanent before other rights to a child may be terminated. *State ex rel SOSCF v. Armijo*, 151 Or App 666, 682, 950 P2d 357 (1997). During a period of over four years, mother has been given numerous opportunities to prove herself and start over as a parent. She has been involved in intensive alcohol treatment programs. She has participated in at least four residential and two out-patient programs. She has received parent training, in-home parenting assistance, and other support services. In addition, she has been involved in mental health programs for the purpose of treating her depression and bipolar disorder.

Mother recognizes her pattern of treatment and relapse, but points to her recent success in treatment as evidence of her lasting adjustment. It is appropriate that we consider the recent changes that mother has made in her life after the termination petition was filed and before trial. Mother's most recent treatment providers believe that she has made real progress in dealing with her addiction. This

information must, however, be considered in the context of mother's history and the expert's assessment of the likelihood that mother's pattern of behavior will continue. The longer a parent's difficulties continue, the greater the risk to a child. The opportunities for a parent to adjust conduct and conditions so as to be a minimally adequate parent simply cannot be unlimited. At some point, the child's needs for permanence and stability in life must prevail.

Unfortunately, we believe that we have reached that point in this case. As the trial court concluded, the pattern of mother's behavior, as well as the evidence from the experts who evaluated mother, support the conclusion that mother's risk of relapse is significant. At the same time, as discussed above, child's fairly immediate need for permanence and stability in the near future is significant. As Dr. Sweet explained:

"When you look at what's happened with her in the past and choices she's made, it makes it even more critical to me she be allowed that opportunity to demonstrate on her own for a year and half to two years. But that's meeting her [mother's] time and developmental needs is quite different [from] meeting a young child's developmental needs * * * I believe it's already been too long for the child to wait for permanency."

Based on all of the above evidence, we conclude that mother's conduct and condition has resulted in serious detriment to child and that it is improbable that mother will make a lasting adjustment that will allow her to consistently provide adequate care for her child within a reasonable time.

■      The final issue that must be addressed is whether termination is in child's best interests. In view of the strong likelihood that mother will suffer a relapse, thereby again disrupting the stability in child's life, as well as child's age and immediate need for permanence and stability, we conclude, as did the trial court, that it is in child's best interests for mother's parental rights to be terminated.

■      Mother also argues that her trial counsel was inadequate, because counsel did not present evidence that was favorable to mother concerning child's dental care. She also contends that trial counsel was inadequate by failing to

object to testimony by child's foster mother regarding child's dental needs. However, mother's handling of child's dental needs does not appear to have been a factor of any significance in the trial court's decision to terminate mother's parental rights, and it is not a consideration in our decision. For all of the above reasons, we hold that the trial court did not err in terminating mother's parental rights.

Affirmed.